Harold E. STEELE, Don Peterson, Rev.
David Maynard, Harmon Wray, Rev.
Tom Baker, Jr., Individually, and as
State Tax Payers and as Members of
Americans for Religious Liberty; and
Americans for Religious Liberty, a
Foreign, Not–For–Profit Corporation,
Plaintiffs,

v.

The INDUSTRIAL DEVELOPMENT
BOARD OF THE METROPOLITAN
GOVERNMENT OF NASHVILLE
AND DAVIDSON COUNTY; the Met-
ropolitan Government of Nashville
and Davidson County; David Lips-
comb University; Sovran Bank; Sov-
ran Bank/ Tennessee.  Defendants.

No. CIV. 3:91–0421.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 24, 2000.

Joseph Howell Johnston, David Randolph Smith, David Randolph Smith & Associates, Nashville, TN, for Plaintiffs.

Bobby Dean Davis, Madison, TN, James Lawrence Charles, James Leo Murphy, III, Paul D. Krivacka, Bradley Alan MacLean, Farris, Warfield & Kanaday, Robert J. Warner, Jr., Watkins, McGugin, McNeilly & Rowan, James Logan McElroy, Baker, Donelson, Bearman & Caldwell, Nashville, TN, for Defendants.

### MEMORANDUM

TRAUGER, District Judge.

In this proceeding to invalidate a political subdivision's bond issue to benefit a private, religious university, the principal inquiry is whether the bond issue violates the Establishment Clause of the First Amendment of the United States Constitution.

The court has before it motions for summary judgment filed by Defendant David Lipscomb University ("Lipscomb"), Defendant Metropolitan Government of Nashville ("Metro"), and the plaintiffs. Defendant Industrial Development Board of the Metropolitan Government of Nashville and Davidson County ("Industrial Development Board" or "Board"), Defendant Sovran Bank, and Defendant Sovran Bank/Tennessee have not filed motions for summary judgment and have not responded to the plaintiff's motion for summary judgment.

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

David Lipscomb University, founded in 1891, describes itself as a "liberal arts university." (Docket No. 269, para. 4) It is located in Nashville, Tennessee, and has an enrollment of approximately 2,500 students. (Docket No. 269, para. 4) It is affiliated with the Churches of Christ, and its primary mission has been to integrate Christian faith and practice with the pursuit of academic excellence. (Docket No. 269, para. 4)

During the early 1990s, Lipscomb undertook a major redevelopment project on its campus. To finance the project, Lipscomb sought a $15 million, low-interest loan from the Industrial Development Board. The Industrial Development Board approved the loan and financed it by issuing tax-exempt industrial development bonds worth $15 million.[1] The bond issue was also approved by Metro's Mayor Bill Boner as federally tax-exempt. The loan from the proceeds of the bonds was used in part to construct and equip a new library, to renovate and convert the old library into administrative offices, and to construct a new intramural athletics building ("or student activities center"), four new tennis courts, a new baseball stadium, an intramural field, and an addition to the school's Business Center. (Docket No. 192, Cochran Aff., para. 10)

The bonds are typical of industrial revenue bonds that are commonly issued for educational or industrial purposes. The

---

[1] There are actually two separate actions by the Board at issue in this case. The Board originally issued bonds for the benefit of Lipscomb in May 1990. (Docket No. 206, Deposition of William Hill Boner, attach. Ex. 10) The Bank with which the bonds were placed to be marketed was First American National Bank. See id. In January 1991, Lipscomb returned to the Board and asked for those bonds to be redeemed and for a new series of bonds to be issued and placed with Sovran Bank. (Docket No. 13, attach. Ex. 3(C)). The financial records that are available relate to these 1991 bonds, so those are the records and agreements considered by the court. With regard to the nature of Lipscomb, however, the parties have offered evidence from both time periods, school years 1989–90 and 1990–91. Whenever possible, the court has used information relating to the 1989–90 year because that is the information that was available to the Board and Metro when the original bonds were issued and any Establishment Clause issues would have been considered.

bonds were issued by the Board pursuant to its authority under state law to issue bonds for the financing of projects for "[a]ny nonprofit educational institution in any manner related to or in furtherance of the educational purposes of such institution, including but not limited to classroom, laboratory, housing, administrative, physical education, and medical research and treatment facilities." TENN. CODE ANN. § 7–53–101(11)(A)(vii) (1990 Supp.).[2] Because the bonds were issued as education revenue bonds by the Board, the income produced by the bonds is exempt from state taxation. In addition, the bonds were approved by both the Board and Metro's Mayor under the provisions of 26 U.S.C. § 103 (1994), making the interest on the bonds federally tax exempt. Consequently, the bonds carry a lower interest rate than conventional financing, and Lipscomb realizes the benefit through the resulting lower interest rate on its loan from the Board.

The plaintiffs are state and local taxpayers residing in the Nashville area. They contend that the issuance of tax-exempt revenue bonds for David Lipscomb University provides an impermissible benefit to a pervasively sectarian institution, thereby violating the Establishment Clause of the First Amendment of the United States Constitution. (Docket No. 200) Such aid, they argue, has the impermissible effect of advancing religion because a substantial portion of Lipscomb's functions are subsumed in its religious mission. (Docket No. 200) Plaintiffs and/or their counsel objected to the issuance of the bonds on this basis at public hearings and meetings of the Board held on April 10, 1990, April 16, 1990,[3] May 30, 1990 and January 22, 1991.[4] (Docket No. 275, para. 9) When the bonds were approved over their objection, plaintiffs filed suit in this court on May 30, 1991, as municipal taxpayers challenging the validity of the Board's action in issuing tax-exempt revenue bonds for the benefit of Lipscomb. (Docket No. 1; Docket No. 268, para. 15) Lead plaintiff Harold E. Steele died on April 1, 1998. (Docket No. 273, para. 2)

The plaintiffs were found to have standing to bring this suit as municipal taxpayers who have an interest in preventing their local government from subsidizing religious institutions. (Docket No. 83) The plaintiffs argued that the tax base of the state and local governments was reduced by the tax-exempt bonds and, therefore, tax dollars were being expended on behalf of a pervasively religious institution. They asserted that, if tax-exempt bonds had not

**2.** Although § 7–53–101 *et seq.* has remained essentially unchanged since 1990, the code in effect in May 1990 will be used in this case because that was the date of the original issuance of the industrial development bonds.

**3.** At the first public hearing, plaintiff's attorney herein, Joe Johnston, and two ministers spoke against issuing the bonds to Lipscomb. Harmon L. Wray Jr. (a plaintiff herein), after identifying himself as having received a Master of Divinity degree from Duke University Divinity School and a Master of Arts in Religious Ethics from Vanderbilt University, stated, in part:

As an active church man of another denomination, I consider my friends at David Libscomb as brothers and sisters in the Christian faith. But I do not believe that I and other taxpayers should have to subsidize the University's development through the issuance of tax-free bonds.

I am convinced that a very particular version of the Christian faith pervades every aspect of institutional and campus life at Lipscomb, and it is evident that the administration, faculty, and student body are shot through with this theological perspective. There is nothing at all wrong with this, except when the general public is required to help support it through unconstitutional and unwise administrative decisions made by the government bodies such as the one here.

(Docket No. 204, Ex. 3, Public Hearing, Transcript of Proceedings, April 16, 1990, pp. 7, 9)

**4.** The final date, January 22, 1991, relates to the special meeting considering the proposed redemption of the 1990 bonds and the issuance of the 1991 bonds. The prior hearings and meetings related to the issuance of the original bonds.

been issued, Lipscomb would have financed all or part of the project through taxable bonds, which would have provided significant revenue for the city coffers.

Although the Board is an instrumentality of the Metropolitan Government, the bonds do not constitute an indebtedness of either the Board or the Metropolitan Government. (Docket No. 1, attach., Ex. D at 4; Docket No. 197, Cochran Aff., paras. 7–8) Neither the Board nor the Metropolitan Government can be held liable to pay any portion of the principal or interest on the bonds or any costs incident to their issuance. TENN. CODE ANN. § 7–53–306 (1985). No state or local government tax revenues have been or will be spent as a result of the issuance of the bonds. (Docket No. 197, Cochran Aff., para. 7)

The judge originally assigned to this case found that, even if no tax money is spent, taxpayer status is proper grounds for an Establishment Clause challenge to policies that affect the city's general revenue fund. Summary judgment was denied on those grounds and, on interlocutory appeal, the Sixth Circuit Court of Appeals upheld the ruling on standing. *Steele v. Indus. Dev. Bd. of the Metro. Gov't of Nashville and Davidson County,* 39 F.3d 1182 (6th Cir.1994)(unpublished table decision), *cert. denied,* 515 U.S. 1121, 115 S.Ct. 2275, 132 L.Ed.2d 279 (1995).

Lipscomb submitted a renewed motion for summary judgment on December 15, 1995, asserting that the "tax exempt" status the bonds derived from the Board could not have harmed the plaintiffs because the bonds would not have fallen under the Hall Income Tax statute anyway. Because the bonds would mature in less than six months, the university argued, they were demand instruments, which are not taxable under the Hall Income Tax statute. The question of whether the bonds would have fallen under the Hall Income Tax statute if they had not been issued as tax-exempt bonds was certified to the Tennessee Supreme Court. The Tennessee Supreme Court ruled that,

under the plain meaning of the law, bonds are not demand instruments and, therefore, are taxable. *Steele v. Indus. Dev. Bd. of the Metro. Gov't of Nashville and Davidson County,* 950 S.W.2d 345 (1997).

Lipscomb has now filed a third motion for summary judgment on the merits, alleging that its receipt of tax-exempt revenue bonds for its facilities expansion project is not a violation of the Establishment Clause, nor does it have the primary effect of advancing religion. (Docket No. 193) Metro has also moved for summary judgment on several grounds. (Docket No. 189) Oral argument was held May 10, 2000, after which the court requested that the plaintiffs submit a motion for summary judgment. The plaintiffs have moved for summary judgment on the grounds that Lipscomb is so pervasively sectarian that a substantial portion of its function is subsumed in its religious mission. (Docket No. 258) As such, the plaintiffs assert, the $15 million in tax-exempt revenue bonds provided in this case had the impermissible effect of promoting religion as a matter of law. (Docket No. 258)

## II. ANALYSIS

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989). In determining whether the movant has met its

burden, the court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir.1999).

To preclude summary judgment, the nonmoving party "is required to present some significant evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *See id.*, at 255, 106 S.Ct. at 2513.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Street*, 886 F.2d at 1479. If the evidence offered by the nonmovant is "merely colorable," "not significantly probative," or is not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52, 106 S.Ct. at 2510–12.

---

**5.** The volume cap requirements of section 146(a) apply to the aggregate value of private activity bonds issued by the issuer in the calendar year. *See* 26 U.S.C. § 146(a) (1994).

## B. The Issuance of Tax–Exempt Bonds

### 1. Statutory Authority and Standards for Tax–Exempt Bond Issuance

Under 26 U.S.C. § 103, gross income does not include interest on any state or local bonds that are both private activity bonds and qualified under 26 U.S.C. § 141. *See* 26 U.S.C. § 103(a)(b)(1) (1994). A private activity bond is defined, in relevant part, under 26 U.S.C. § 141 as any bond that is part of an issue which meets the "private loan financing test." 26 U.S.C. § 141(a)(2) (1994). The "private loan financing test" is met where "the amount of the proceeds of the issue which are to be used (directly or indirectly) to make or finance loans ... to persons other than governmental units exceeds the lesser of (A) 5 percent of such proceeds, or (B) $5,000,000." 26 U.S.C. § 141(c)(1) (1994).

In order for the interest on the bonds to be exempt from federal taxation, the private activity bonds must also be qualified under 26 U.S.C. § 141(e) (1994). There are three criteria that a bond issuance must meet under this section. First, the bond must fall within one of the enumerated categories: "(A) an exempt facility bond, (B) a qualified mortgage bond, (C) a qualified veterans' mortgage bond, (D) a qualified small issue bond, (E) a qualified student loan bond, (F) a qualified redevelopment bond, or (G) a qualified 501(c)(3) bond." 26 U.S.C. § 141(e)(1) (1994). Second, the bond issue must meet the volume cap requirements of section 146.[5] 26 U.S.C. § 141(e)(2) (1994); *see also* 26 U.S.C. § 146 (1994). Finally, the bond issue must meet the requirements of each applicable subsection of section 147. 26 U.S.C. § 141(e)(3) (1994). Under the public approval requirement of section 147(f), in order to be a qualified bond a private activity bond must be approved by both the governmental unit issuing the bond

---

There have been no claims that the Board exceeded its cap in issuing the bonds at issue in this case, and the court will presume it did not.

and the governmental unit that has jurisdiction over the area in which the facility receiving financing through the bond proceeds is located. *See* 26 U.S.C. § 147(f)(2)(A) (1994).

A bond that meets each of these criteria will be designated as a qualified private activity bond under 26 U.S.C. § 103. Where the bonds issued are qualified private activity bonds, the interest from the bonds will be exempt from federal taxation. 26 U.S.C. § 103 (1994).

In this case, the bonds were issued for the benefit of Defendant David Lipscomb University, a private educational institution. (Docket No. 259, para. 13; Docket No. 273, para. 13) The proceeds of the bonds, in the amount of $15,000,000, were loaned to Lipscomb for building and renovating facilities on its campus. (Docket No. 1, para. 28; Docket No. 2, para. 28; Docket No. 3, para. 8; Docket No. 4, para. 28; Docket No. 273, para. 6) This meets the "private loan financing test" of section 141(c) because the entire amount of bond proceeds loaned to Lipscomb exceeded the statutory minimum loan amount. Therefore, the bonds may be characterized as private activity bonds under 26 U.S.C. § 141(a) (1994).

In order to be tax exempt, the bonds must also be qualified under the provisions of section 141(e). 26 U.S.C. § 103 (1994) The bond issue meets the first criteria for being a qualified private activity bond under section 141(e)(1) because the bonds are qualified 501(c)(3) bonds, which is one of the enumerated categories of bond types under this section. *See* 26 U.S.C. § 141(e)(1) (1994). A qualified 501(c)(3) bond is defined in section 145(a) as a private activity bond where "all property which is to be provided by the net proceeds of the issue is to be owned by a 501(c)(3) organization."[6] 26 U.S.C. § 145(a)(1) (1994). All of the proceeds of the $15,000,000 bond issue were loaned to

Lipscomb for use in building new facilities and in renovating existing facilities. (Docket No. 191, para. 10; Docket No. 192, Cochran Aff., para. 10) Lipscomb is a registered 501(c)(3) organization. (Docket No. 13, attach. Ex. A, Tab 6) Because all of the proceeds of the bond issue were used to provide property owned by a 501(c)(3) organization, the bond issue satisfies the first requirement of section 141(e).

The final requirement of the statutory scheme for issuing federal tax-exempt bonds is that the bonds must satisfy each of the subsections of section 147. 26 U.S.C. § 141(e)(3) (1994). The only subsection applicable to the bond issue in this case is section 147(f), which provides that a private activity bond will not be a qualified bond unless it meets the subsection's public approval requirement. 26 U.S.C. § 147(f) (1994). This requirement is satisfied where the bond issue has been both (1) approved either by or on behalf of the governmental unit that issued the bonds, and (2) approved by each governmental unit that has jurisdiction over the area where any facilities which are to be financed by the bond proceeds are located. 26 U.S.C. § 147(f)(A) (1994). In each case, the approval must be given by either "the applicable elected representative of such governmental unit after a public hearing following reasonable notice" or by a voter referendum of the governmental unit. 26 U.S.C. § 147(f)(B) (1994). The elected representative may be an elected legislative body of the governmental unit, "the chief elected executive officer, the chief elected State legal officer of the executive branch, or any other elected official of such unit designated for the purposes of this paragraph by such chief elected executive officer or by State law." 26 U.S.C. § 147(f)(2)(E)(i) (1994).

The "scope" of the governmental approval is addressed in federal regulations, which state:

---

**6.** Section 145 also contains other restrictions on the bonds that have no significant bearing on this case. The only other applicable limit is the $150,000,000 limit placed on the aggregate issue, which the bond issue here does not exceed. *See* 26 U.S.C. § 145(b)(1) (1994).

An issue is treated as approved if the governmental units ... have approved either -

(i) The issue ... not more than one year before the date of issue, or

(ii) A plan of financing for each facility financed by the issue pursuant to which the issue in question is timely issued (as required in paragraph (f)(3) of this section).

In either case, the scope of the approval is determined by the information, as specified in paragraph (f)(2), contained in the notice of hearing ... and the approval.

(2) Information required. A facility is within the scope of an approval if the notice of hearing ... and the approval contain -

(i) A general, functional description of the type and use of the facility to be financed ...

(ii) The maximum aggregate face amount of obligations to be issued with respect to the facility,

(iii) The initial owner, operator, or manager of the facility,

(iv) The prospective location of the facility by its street address or, if none, by a general description designed to inform readers of its specific location.

... An approval or notice of public hearing will not be considered to be adequate if any of the items in subdivisions (i) through (iv) of this subparagraph (2), with respect to the facility to be financed, are unknown on the date of the approval or the date of the public notice.

26 C.F.R. § 5f.103–2(f) (1999).

In this case, the bond issue was approved by the Industrial Development Board as the governmental unit that issued the bonds and by Mayor Bill Boner as the chief elected executive officer of Metropolitan Government of Nashville and Davidson County, the governmental unit in which the facilities of David Lipscomb University are located. (Docket No. 191, paras. 14–17; Docket No. 201, paras. 14–17)

There were two public hearings on the bond issue prior to the final issuance by the Board and approval by the mayor on May 30, 1990, and the plaintiffs do not allege that there was either inadequate notice of those hearings or inadequate information in the notices or approvals. (Docket No. 259, paras. 9, 12, 13; Docket No. 273, paras. 9, 13)

The technical statutory requirements for creating federally tax-exempt bonds are clear, but there is little guidance on the standard to be used by the governmental units deciding whether to grant public approval. The Board has offered no information on this question and has not responded to the plaintiffs' Motion for Summary Judgment. Metro has offered a variously-worded standard, which states, in essence, that the bond issue must be for a legitimate public purpose and/or must create a substantial public benefit. (Docket No. 190 at 9, 11–16, 28–29; Docket No. 191, paras. 19–21, 23–24; Docket No. 273, para. 5; Docket No. 286 at 6–9) According to its briefs, Metro has taken this language from the Tennessee statutory definition of "public purpose," TENN. CODE ANN. 7–53–102(a) (1985), and from the Report of the Senate Finance Committee in recommending the public notice and approval requirements. See S.Rep. No. 494(I), 97th Cong., 2nd Sess.1982, 1982 U.S.C.C.A.N. 781; Docket No. 190 at 15–16; Docket No. 286 at 7–9.

The court can find no standard for the public approval in the statutory scheme regarding the issuance of federal tax-exempt bonds. In the Committee Report referenced by Metro, the Senate Finance Committee explains its reasoning in recommending the public approval requirement, specifically in relation to industrial development bonds:

The committee believes that new restrictions are needed on IDBs to help eliminate inappropriate uses and to help restore the benefit of tax-exempt financing for traditional governmental purposes. However, the committee believes

that, in general, state and local governments are best suited to determine the appropriate uses of IDBs. The committee believes that providing tax exemptions for the interest on certain IDBs may serve legitimate purposes in some instances *provided that the elected representatives of the state or local governmental unit determine after public input that there will be substantial public benefit from issuance of the obligations* and provided that the affected public has had an opportunity to comment on the use of tax-exempt financing for particular facilities. In order to achieve this goal, the committee bill requires notice and a public hearing and approval by an elected representative of the issuer before issuance of any IDBs.

S.Rep. No. 494(I), 97th Cong., 2nd Sess. 1982, 1982 U.S.C.C.A.N. 781, 930 (emphasis added). This legislative history comports with a reasonable interpretation of the statute requiring public approval, and Metro seems to have adopted this standard willingly. (Docket No. 190 at 9–16; Docket No. 273, para. 5; Docket No. 286 at 8–9) Therefore, this court finds that in determining whether to grant approval to the bonds as federally tax-exempt under 26 U.S.C. § 147(f), the Industrial Development Board and Mayor Bill Boner were each required to determine that the issuance of the bonds would serve a legitimate public purpose and/or create a substantial public benefit.

### 2. Board's Role in the Issuance of Tax–Exempt Bonds

Under Tennessee law, a development board may be incorporated when at least three taxpayers make written application to a municipality and the municipal government determines:

that it is wise, expedient, necessary or advisable that the corporation be formed and shall authorize the persons making such application to proceed to form such corporation and shall approve the form of certificate of incorporation proposed to be used in organizing the corporation, then the persons making such application shall execute, acknowledge and file a certificate of incorporation for the corporation as hereinafter provided. No corporation may be formed unless such application shall have first been filed with the governing body of the municipality and the governing body shall have adopted a resolution as provided in this section.

TENN. CODE ANN. § 7–53–201 (1985). In this case, Metro approved creation of the corporation by resolution as the statute required.

The approved incorporation papers must then be filed with the Secretary of State's office. Once the incorporation has been approved, the development board can only amend its incorporation papers if the governing body (here Metropolitan Government) determines that it is "wise, expedient, necessary or advisable that the proposed amendment be made." TENN. CODE ANN. § 7–53–204 (1985).

Industrial development boards have considerable statutory powers, including authority to enter loan agreements with private third parties, sue and be sued, sell any or all of their properties, including the rents, revenues and receipts of the board, issue bonds, and borrow money from banks or other financial institutions by issuing notes. TENN. CODE ANN. § 7–53–302 (1990 Supp.).

Among these statutory powers, the industrial development board is empowered to approve tax-exempt bonds for various public works and projects, including "[a]ny nonprofit educational institution in any manner related to or in furtherance of the educational purposes of such institution, including, but not limited to classroom, laboratory, housing, administrative, physical education, and medical research and treatment facilities." TENN. CODE ANN. § 7–53–101(11)(A)(vii) (1990 Supp.). After approval and sale of the bonds, municipal governments that approve them are not

liable for re-payment of the debt. Tenn. Code Ann. § 7–53–306 (1985).

The Board issued the industrial development bonds benefitting David Lipscomb University pursuant to this state authority.[7] In addition, the Board approved the bonds to be federally tax-exempt (Docket No. 3, para. 8) as established under the provisions of 26 U.S.C. § 103 (1994). The Board held two public hearings prior to issuing final approval of the bond issue, although the Board members were only present for the second of these hearings. (Docket No. 1, attach. Exs. F–G) In approving the bond issue as tax exempt, the Board had to find that the bond issue served a legitimate public purpose and/or created a substantial public benefit. There cannot be a legitimate public purpose that violates the United States Constitution. In approving the bond issue as serving a legitimate public purpose, therefore, the Board was necessarily required to determine that the issue would not conflict with the Establishment Clause of the First Amendment.

### 3. Metro's Role in the Issuance of Tax–Exempt Bonds

Metro contends that summary judgment should be granted in its favor because it cannot be held liable for the Industrial Development Board's issuance of tax-exempt revenue bonds. (Docket No. 189) Metro contends that the statutes and regulations incorporating and empowering the Board provide a shield, protecting the Metropolitan Government from liability in the issuance of the bonds because plaintiffs can sue directly the Industrial Development Board, the entity that issued the

bonds. But this fact does not insulate Metro from its own responsibility in the approval of the bonds. Without Metro's approval, the bonds could not have been issued as federally tax-exempt.

In granting approval, the mayor is required under § 147(f) to ascertain whether the issuance of the bond in question serves a legitimate public purpose and/or creates a substantial public benefit. Metro argues that the mayor's inquiry is limited to determining whether the bond issue contains the four pieces of "information required" under the federal regulations interpreting the public approval requirement, 26 C.F.R. § 5f.103–2(f) (1999). (Docket No. 190 at 11) This argument is based on a misreading of the regulation, which clearly states that these four pieces of information determine the "scope of the approval" and the adequacy of the approval and public notice. See 26 C.F.R. § 5f.103–2f(1)–(2) (1999). In other words, no public notice or approval will be valid if all of this information is not spelled out and made public. The regulation cannot be read to limit Metro's consideration to these four things and foreclose it from constitutional considerations. And Metro concedes in its papers that its "actions are limited by the United States Constitution ...". (Docket No. 273, para. 5) Metro's interpretation would make Metro an instrumentality of the Industrial Development Board when, in fact, the opposite is true. "The corporation is hereby declared to be performing a public function in behalf of the municipality with respect to which the corporation is organized and to be a public instrumentality of such municipality."[8] Tenn. Code Ann. § 7–53–

---

7. Because the Industrial Development Board has failed to respond to the plaintiffs' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, pursuant to Local Rule 8(b)(7), the court will take the sixty (60) facts asserted therein as undisputed by the Board. *See Grimes v. Superior Home Health Care of Middle Tenn., Inc.*, 929 F.Supp. 1088, 1096 (M.D.Tenn.1996).

8. As outlined in the previous section, Tennessee law required Metro to approve the incor-

poration of the Industrial Development Board. The Board cannot amend its incorporation papers without the consent of Metro. The Board described itself as an instrumentality of Metro in the Official Statement accompanying the bond re-issue in 1991. (Docket No. 1, attach., Ex.D at 4) This description was prepared by the Board, approved by the Board, and signed by the Chairman of the Board. *Id.* at 36–37. In addition, section 7–53–305(a) states: "bonds issued by the corporation shall be deemed to be securities issues

305(a) (1990 Supp.); Docket No. 1, attach., Ex. D at 4; *see also* Docket No. 192, Cochran Aff., para. 8. The Court finds that the Industrial Development Board is an instrumentality of Metro.

This court has accepted the standard put forth by Metro that, in order to grant approval of the bonds as federally tax-exempt, the mayor must determine that the bond issue serves a legitimate public purpose and/or creates a substantial public benefit. The mayor was at least generally aware of this standard when he approved the bond issue, as indicated in a letter to the Board written by the mayor before he granted approval. (Docket No. 206, Deposition of William Hill Boner, Ex. 3; Docket No. 273, para. 5) In requesting that the Board hold a second public hearing and review the bond issue it had previously approved, the mayor stated,

> I am advised that the purpose of the public hearing and approval requirement is to allow for more informed decisions by the local government unit as to the public benefit to be derived from the issuance of the obligations as well as to provide the affected public with a reasonable opportunity to comment on the use of tax-exempt financing for particular facilities. These considerations are relevant not only for my review but also to the Board as it exercises its statutory responsibilities.

(Docket No. 206, Deposition of William Hill Boner, Ex. 3)

Although Metro and the mayor seem to have been aware of the standard for public approval of the bond issue, there is little evidence in the record of efforts made by the mayor to determine whether the bond issue in question met that standard. In his deposition, Mayor Boner admitted that he did not review the administrative record of any of the public hearings concerning the bond issue. (Docket No. 206 at 33–34, 59) Mayor Boner has no recollection of reading or considering a number of letters sent to his office highlighting concerns about possible conflicts with the First Amendment in issuing tax-exempt bonds to assist a private, religious institution. *Id.* at 34–38, 59. Mayor Boner also admitted that he did not personally review any of the issues or documents relating to this determination or to the question of whether the bond issue would violate the Establishment Clause of the First Amendment. (Docket No. 206, Deposition of William Hill Boner, at 59–60) Instead, the mayor stated repeatedly that he relied entirely on the Metropolitan Legal Department's recommendation regarding his responsibilities in the approval of the bond issue. *Id.* at 33, 38, 45–47. Metro has admitted, however, that the Mayor did not consult with the Legal Department on any Establishment Clause issues during the period he was considering the bond issue in this case. (Docket No. 273, para. 36; Docket No. 206, Deposition of William Hill Boner, at 12)

With regard to the religious nature and characteristics of David Lipscomb University, Metro has admitted that the mayor did not investigate the degree of affiliation between the institution and the Churches of Christ. (Docket No. 273, para. 38; *see also* Docket No. 206, Deposition of William Hill Boner, at 14) Mayor Boner also did not read the corporate charter of Lipscomb (Docket No. 273, para. 39; *see also* Docket No. 206, Deposition of William Hill Boner, at 14), and the mayor was unaware of the stated purpose of the university, as contained in that charter, when he granted approval to the bond issue to be tax exempt. (Docket No. 273, para. 40; *see also* Docket No. 206, Deposition of William Hill Boner, at 4) Mayor Boner did not review any Lipscomb publications outlining the goals and objectives of the university. (Docket No. 273, para. 42; *see also* Docket No. 206, Deposition of William Hill Boner,

by a public instrumentality or a political subdivision of the state of Tennessee.'' TENN. CODE ANN. § 7–53–305(a) (1990 Supp.).

at 15) Finally, the mayor was unaware of restrictive covenants on the property owned by Lipscomb and of the mandatory attendance requirements for Lipscomb students in Bible classes and at chapel services. (Docket No. 273, paras. 41, 43–44; *see also* Docket No. 206, Deposition of William Hill Boner, at 15)

The court is not directly considering the duty of care owed by the mayor in investigating and approving the bond issue in this case, but the court is concerned with whether the bond issue violated the Establishment Clause of the First Amendment. In granting approval for the bonds to be federally tax-exempt, the mayor was required to determine that the bond issue served a legitimate public purpose and/or created a substantial public benefit. A bond issue that infringes upon the Establishment Clause cannot meet this standard.

Without the mayor's approval of the bond issue as meeting the federal requirements, the bonds could not have been issued as federally tax-exempt and no suit would be before this court. Therefore, because of the significant role that the Metropolitan Government plays in this process, both through the action of its mayor and by virtue of the fact that the Board is an instrumentality of Metro, defendant Metro's position that the issuance of tax-exempt revenue bonds to Lipscomb was an act solely attributable to the Industrial Development Board is untenable.

Summary judgment on this ground will be denied to Metropolitan Government.

### C. Establishment Clause

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof..." U.S. CONST. amend. I. From the earliest consideration of Establishment Clause challenges, courts have found it easier to identify the lofty goals of the First Amendment than to apply it in these cases. In the more than fifty years since the Supreme Court found the Establishment Clause applicable to the

states in *Everson v. Board of Ed. of the Township of Ewing,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court has continued to struggle in defining the limits of state action under the Establishment Clause and in creating guidelines for the states and the courts to follow:

> It is easy enough to quote the few words comprising that clause—'Congress shall make no law respecting an establishment of religion.' It is not at all easy, however, to apply this Court's various decisions construing the Clause to governmental programs of financial assistance to sectarian schools and the parents of children attending those schools. Indeed, in many of these decisions, "we have expressly or implicitly acknowledged that 'we can only dimly perceive the lines of demarcation in this extraordinarily sensitive area of constitutional law.'"

*Mueller v. Allen,* 463 U.S. 388, 392–93, 103 S.Ct. 3062, 3065–66, 77 L.Ed.2d 721 (1983) (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 609, 612, 91 S.Ct. 2105, 2109, 2111, 29 L.Ed.2d 745 (1971), *quoted with approval in Committee for Public Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 761, 93 S.Ct. 2955, 2959, 37 L.Ed.2d 948 (1973)).

In *Lemon v. Kurtzman,* the Court recognized "the three main evils against which the Establishment Clause was intended to afford protection: sponsorship, financial support, and active involvement of the sovereign in religious activity." 403 U.S. at 612, 91 S.Ct. at 2111 (internal citations and quotation marks omitted). The Court then articulated its now-familiar three-pronged test for affording this protection. First, the statute must have a secular, legislative purpose. Second, its principal or primary effect must be one that neither advances nor inhibits religion. Finally, the statute must not foster an excessive government entanglement with religion. *Id.,* at 612–13, 91 S.Ct. at 2111. In *Agostini v. Felton,* the Court found that

the entanglement prong, while still important, has essentially evolved into a consideration within the primary effect prong of the test. 521 U.S. 203, 232–33, 117 S.Ct. 1997, 2015, 138 L.Ed.2d 391 (1997). As a result, the analysis of the "effects" prong of the *Lemon* test consists of three primary considerations: (1) whether the statute results in government indoctrination; (2) whether the statute defines its recipients by reference to religion; and (3) whether the statute creates an excessive entanglement. *See id.*, at 234, 117 S.Ct. 1997, 117 S.Ct. at 2016. Within that framework, the Court has reiterated that the analysis of excessive entanglement involves the same factors as when it was a separate consideration: (1) the character and purposes of the institution benefitted; (2) the nature of the aid the state provides; and (3) the resulting relationship between government and religious authority. *Id.*, at 232, 117 S.Ct. at 2015.

The plaintiffs challenge the issuance of tax-exempt bonds to David Lipscomb University on the grounds that it is an action by the Industrial Development Board and by the Metropolitan Government of Nashville and Davidson County in violation of the Establishment Clause of the First Amendment. The plaintiffs assert that they are entitled to summary judgment because, as a matter of law, Lipscomb is so pervasively sectarian that the substantial tax benefit conferred directly on the school, in effect, was state sponsorship of the school's Christian indoctrination.

The defendants assert that the plaintiffs' motion for summary judgment should be denied and the defendants' motions granted because the Supreme Court's recent decision, *Mitchell v. Helms*, 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), affirms the defendants' position that, because the tax benefit to Lipscomb promotes a legitimate, secular, legislative

purpose, there is no First Amendment violation. In addition, Lipscomb asserts that, under *Mitchell*, the pervasively sectarian test is no longer viable and, even if it were, the benefit conferred upon Lipscomb is merely a tax exemption that has long been an acceptable indirect benefit to religious institutions.

The parties in this case agree that the statute has a secular purpose as written. Therefore, the court need consider only whether the governmental aid in this case has the primary effect of fostering or promoting religion. To determine whether the tax-exempt bonds have such an effect, the court must determine whether this aid (1) results in governmental indoctrination; (2) defines its recipients by reference to religion; or (3) creates an excessive entanglement. *Agostini*, 521 U.S. at 234, 117 S.Ct. at 2016.

### 1. Possible Lines of Analysis under Establishment Clause Precedent

While the statute authorizing the tax-exempt bond issue does not identify the recipients by reference to religion, Metro's authorization of the bond issue fails the other two criteria used to determine whether the government benefit advances religion: it results in governmental indoctrination and creates an excessive entanglement. In making this determination, the court relies on three separate lines of analysis provided by the Supreme Court and other lower courts to determine whether government aid to a religious institution violates the Establishment Clause.[9] Because the Court has repeatedly noted the difficulty in evaluating individual cases under the Establishment Clause, this court will examine the facts of this case under each of these three approaches.

The first approach relies on the line of cases considering state aid directly given to colleges and universities, as discussed

**9.** The plaintiffs base their arguments on only one line of cases, those prohibiting government aid from being given to pervasively sectarian institutions. As explained, however, the court has determined that a thorough evaluation of this case requires going beyond this single approach.

primarily in *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), *Hunt v. McNair,* 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), and *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976). This line of cases provides the most directly controlling precedent to the case at hand, establishing that a government may not provide financial aid to a pervasively sectarian institution. All three cases confront financial assistance provided to colleges and universities by the states in the form of grants or the proceeds of revenue bonds. These facts parallel the case before the court, and the decisions in these cases provide the best framework for analyzing the constitutionality of the tax-exempt bonds issued for the benefit of Lipscomb.

Although the above cases provide the most directly-applicable analysis of the instant case, they do not represent the most recent decisions by the Court concerning government aid in various forms to religious schools and institutions. The more recent cases, including *Agostini, Mitchell v. Helms,* 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000), and *Rosenberger v. Rector and Visitors of the University of Virginia,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), cover a variety of aid programs and schools. They provide a different framework of analysis for the Lipscomb bond issue, focusing on specific details of the aid program, such as the neutrality of the program, the role of private individuals in determining the recipients of the aid, and the safeguards implemented to ensure that the aid will support only the secular functions of the religious institutions. These cases are not all factually similar to the instant case, but they provide additional guidance for evaluating the assistance given to Lipscomb as a result of the tax-free bond issue.

Finally, many of the Court's decisions involve, at least in part, a consideration of whether the government action would be interpreted by a reasonable observer as an endorsement of religion. *See, e.g., Rosenberger,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992); *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). As Justice Brennan explained for the plurality in *Texas Monthly, Inc. v. Bullock,*

> In proscribing all laws 'respecting an establishment of religion,' the Constitution prohibits, at the very least, legislation that constitutes an endorsement of one or another set of religious beliefs or of religion generally. It is part of our settled jurisprudence that 'the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization.'

489 U.S. 1, 8–9, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989) (plurality opinion) (quoting *Gillette v. United States,* 401 U.S. 437, 450, 91 S.Ct. 828, 836, 28 L.Ed.2d 168 (1971)). According to this approach, if the government action would be considered an endorsement of religion by a reasonable observer, then the action has the impermissible effect of advancing religion in violation of the Establishment Clause. Thus, the endorsement test provides a third analytical tool for evaluating the bond issue in this case.

Each of the above tests is simply a framework for evaluating whether a specific government action is in violation of the Establishment Clause because it has the primary effect of advancing or inhibiting religion. An analysis of this case under each of these lines of cases draws a better picture of the government's actions in relation to what the Court has found to be permissible and impermissible under the Establishment Clause.

### 2. Pervasively Sectarian Test

In *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), which was issued the same day as *Lemon*, the Court stated that the "crucial question" concerning government aid to religiously affiliated schools "is not whether some benefit accrues to a religious institution as a consequence of the legislative program, but whether its principal or primary effect advances religion." 403 U.S. at 679, 91 S.Ct. at 2096. The Court recognized the possibility that there could be cases in which "religion so permeates the secular education provided by church-related colleges and universities that their religious and secular educational functions are in fact inseparable." *Id.*, at 680, 91 S.Ct. at 2097. These "pervasively sectarian" institutions cannot receive government financial assistance without the impermissible effect of advancing the religious beliefs of the institutions. *See Roemer*, 426 U.S. at 755, 96 S.Ct. at 2349. The plaintiffs rely on this theory and claim that providing aid to David Lipscomb University violated the Establishment Clause because Lipscomb "is so pervasively sectarian that a substantial portion of its function is subsumed in its religious mission." (Docket No. 258, para. 3).

#### a. Mitchell v. Helms and the Status of the Pervasively Sectarian Test

As an initial matter, the defendants have questioned whether this line of cases is an appropriate basis for considering the Lipscomb bond issue. The defendants have argued that the "pervasively sectarian" test is no longer valid under Establishment Clause jurisprudence, thus, the court should not evaluate the Lipscomb bond issue under that approach. The defendants rely on the plurality opinion of Justice Thomas in *Mitchell v. Helms* for this proposition. *See Mitchell*, 530 U.S. 793, 120 S.Ct. 2530, 2550–52, 147 L.Ed.2d 660 (2000) (plurality opinion).

The defendants are correct that the plurality opinion in *Mitchell* indicates that the "pervasively sectarian" test should no longer be used in evaluating Establishment Clause claims. Justice Thomas states that "there was a period when this factor mattered, particularly if the pervasively sectarian school was a primary or secondary school.... But that period is one that the Court should regret, and it is thankfully long past." *Id.*, 530 U.S. at ——, 120 S.Ct. at 2550. Justice Thomas finds that "nothing in the Establishment Clause requires the exclusion of pervasively sectarian schools from otherwise permissible aid programs, and other doctrines of this Court bar it. This doctrine, born of bigotry, should be buried now." *Id.*, 530 U.S. at ——, 120 S.Ct. at 2552.

■ *Mitchell*, like many of the Court's recent Establishment Clause cases, is a plurality opinion. Justice Thomas wrote the plurality opinion, and it was joined by Chief Justice Rehnquist and by Justices Scalia and Kennedy. *See id.*, 530 U.S. at ——, 120 S.Ct. at 2536. Justice O'Connor wrote an opinion, concurring in the judgment only, in which Justice Breyer joined. *See id.*, 530 U.S. at ——, 120 S.Ct. at 2556. Neither Justice O'Connor nor Justice Breyer joined in any portions of the plurality opinion written by Justice Thomas. It is well settled that in a plurality opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Coe v. Bell*, 161 F.3d 320, 354 (6th Cir.1998)(quoting *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)); *see also, Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 764, fn. 9, 108 S.Ct. 2138, 2148, 100 L.Ed.2d 771 (1988); *Reese v. City of Columbus*, 71 F.3d 619, 625 (6th Cir.1995). In *Mitchell*, there is no single part of any opinion that commands the support of a majority of the Court. As a result, the only binding precedent of *Mitchell* is the holding. *See* Igor Kirman, Note, *Standing Apart to be A Part: The Precedential Value of Supreme Court Concurring Opinions*, 95 COLUM. L.

REV.2083, 2084–85 (1995); Ken Kimura, *A Legitimacy Model for the Interpretation of Plurality Decisions*, 77 CORNELL L. REV. 1593, 1596–98 (1992).

This court will not abandon a recognized and applicable test under Establishment Clause jurisprudence unless and until the Supreme Court has clearly determined that it is no longer a valid approach. In fact, Justice Thomas supported this position in *Mitchell* and cited the admonition of the Court from *Agostini v. Felton:*

> We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent. We reaffirm that '[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'

*Agostini*, 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989)), *cited in Mitchell v. Helms*, 530 U.S. at ——, 120 S.Ct. at 2539 (plurality opinion). The cases establishing that government financial aid may not be provided to pervasively sectarian universities are the most directly applicable precedent for deciding the case at hand. The Supreme Court has not overruled these cases. Therefore, this court will examine the Lipscomb bond issue under this approach to determine whether the aid provided to Lipscomb had the effect of advancing religion in violation of the Establishment Clause.

### b. Development of the Pervasively Sectarian Test

The pervasively sectarian test is based on the line of cases beginning with *Tilton* and extending through *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). In *Hunt v. McNair,* the Court found that "[a]id normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). Thus, the rule under the pervasively sectarian test, as stated in *Roemer v. Board of Public Works of Maryland,* 426. U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), is that "no state aid at all go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones ...." 426 U.S. at 755, 96 S.Ct. at 2349.

In *Tilton,* the Supreme Court considered a federal program offering construction grants for schools and colleges under Title I of the Higher Education Facilities Act of 1963. *See* 403 U.S. at 674, 91 S.Ct. at 2094. In general, the Court found that the aid program was carefully administered to make sure that the funds did not go to pervasively sectarian colleges: some colleges were declared ineligible to receive funds, and those religiously affiliated schools that did receive funds were not so sectarian that religion permeated their teachings. *See id.,* at 679–80, 682, 91 S.Ct. at 2096, 2097. Thus, the Court refused to strike down a direct federal grant to four Roman Catholic colleges and universities in Connecticut because none of the four colleges was pervasively sectarian.[10] *Id.,* at 682, 91 S.Ct. at 2097.

10. The four Roman Catholic institutions receiving federal aid were Sacred Heart University, Annhurst College, Fairfield University and Albertus Magnus College. Federal funds were used for five projects at these four institutions: (1) a library building at Sacred Heart; (2) a music, drama, and arts building at Annhurst; (3) a science building at Fairfield; (4) a library building at Fairfield; and (5) a language laboratory at Albertus Magnus. *Tilton,* 403 U.S. at 676, 91 S.Ct. at 2094.

The Court in *Tilton* observed that none of these church-related colleges compelled attendance at religious services and that the colleges subscribed to a set of well-established principles of academic freedom. *Id.*, at 686–87, 91 S.Ct. at 2099–2100. Moreover, the evidence showed that non-Catholics were admitted as students and given faculty appointments, and the courses taught at the colleges covered a range of human religious experiences and thus were not limited to instruction from a Roman Catholic perspective. *Id.* The Court found that these schools, although affiliated with a religion, were "characterized by an atmosphere of academic freedom rather than religious indoctrination." *Id.*, at 681, 91 S.Ct. at 2097. These facts led the Court to conclude that the institutions could receive federal aid without having the effect of advancing religion. At the same time, Chief Justice Burger's majority opinion held open the likelihood that if pervasively sectarian schools had received the funds, the statute might have been invalid as applied. *See id.*, at 682, 91 S.Ct. at 2097–98. ("Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these characteristics.").

Two years after *Tilton*, the Court considered another aid program benefitting religious schools. In *Hunt v. McNair*, the Court upheld a decision to issue tax-free revenue bonds—substantially similar to those issued in this case—for the benefit of Baptist College at Charleston, South Carolina. *See id.*, at 736–37, 93 S.Ct. at 2870–71. The Court found very little evidence that the college was pervasively sectarian, even though it was governed by the South Carolina Baptist Convention. *Id.*, at 743, 93 S.Ct. at 2874. About 60 percent of the student body was Baptist, but the Court found that this percentage was equivalent to the percentage of Baptists in the area where the school was located. *Id.*, at 744, 93 S.Ct. at 2874. Further, the school had no religious qualifications for faculty mem-

bership or student admittance. *Id.*, at 743–44, 93 S.Ct. at 2874. From the facts, the Court concluded that Baptist College was not pervasively sectarian and, thus, could receive the benefit of the bond issue. *Id.*, at 743, 93 S.Ct. at 2874. Like *Tilton*, however, the Court found that if the state aid had gone to pervasively sectarian colleges, the outcome would have been different. *See id.*

In *Roemer v. Bd. of Public Works of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976), the Court again considered the application of a statute that provided for state grants to private colleges, including church-related colleges. The Court found that several church-related colleges in Maryland that had received state grants were not pervasively sectarian. These colleges were affiliated with the Roman Catholic Church, but they neither received funds from, nor made reports to, the Catholic Church. 426 U.S. at 755, 96 S.Ct. at 2349. The schools employed Roman Catholic chaplains and religious exercises were held on campus, but neither students nor instructors were required to attend. *Id.* Spiritual development was encouraged, but "at none of these institutions does this encouragement go beyond providing the opportunities or occasions for religious experience." *Id.* Some mandatory religion or theology courses were taught, but the district court had required the Council for Higher Education, the organization overseeing the grants, to "take [additional] steps to ensure that no public funds would be used to support religious and theological programs." *Id.*, at 756 n. 20, 96 S.Ct. at 2349 n. 20. The district court also found that nontheology courses were "taught in an atmosphere of intellectual freedom." *Id.*, at 756, 96 S.Ct. at 2349 (internal quotation marks omitted). All of the colleges subscribed to and abided by the Statement of Principles on Academic Freedom of the American Association of University Professors. *Id.* Some of the classes started with prayer, but there was no policy requiring professors to do so.

*Id.* For nontheology departments, faculty hiring decisions were not based upon religion. *Id.*, at 757, 96 S.Ct. at 2350. Under such conditions, the Court stated, "there was little risk that religion would seep into the teaching of secular subjects, and the state surveillance necessary to separate the two, therefore, was diminished." *Id.* As a result, the Court found that these schools were not so pervasively sectarian that state aid limited to secular interests would advance religion.

Finally, in *Bowen v. Kendrick*, the Court held that federal legislation providing grants to pregnancy prevention programs did not violate the First Amendment on its face, although some of the funds went to religious programs. 487 U.S. 589, 617–18, 108 S.Ct. 2562, 2578–79, 101 L.Ed.2d 520 (1988). It would be improper, the Court stated, to assume that all such programs were pervasively sectarian. *Id.*, at 611, 108 S.Ct. at 2575. The court remanded the case to determine whether the statute was unconstitutional as applied, implying that some benefits provided to a pervasively sectarian program may be violative of the First Amendment. *Id.*, at 620–22, 108 S.Ct. at 2580–81.

Although the circuit courts have applied the Supreme Court's pervasively sectarian test to Establishment Clause cases, only the Fourth Circuit has attempted to set out the characteristics of a pervasively sectarian college under the guidelines of *Hunt, Tilton* and *Roemer*. *Columbia Union College v. Clarke*[11], 159 F.3d 151, 163 (4th Cir.1998). In *Columbia Union*, the

court identified four "general areas of inquiry" when evaluating whether a school is pervasively sectarian: "(1) does the college mandate religious worship, (2) to what extent do religious influences dominate the academic curriculum, (3) how much do religious preferences shape the college's faculty hiring and student admission processes, and (4) to what degree does the college enjoy 'institutional autonomy' apart from the church with which it is affiliated." *Id.* According to *Columbia Union*, evidence of the existence of a single factor would not be dispositive, and to find a school pervasively sectarian,

> the college must in fact possess a great many of the following characteristics: mandatory student worship services; an express preference in hiring and admissions for members of the affiliated church for the purpose of deepening the religious experience or furthering religious indoctrination; academic courses implemented with the primary goal of religious indoctrination; and church dominance over college affairs as illustrated by its control over the board of trustees and financial expenditures.

*Id.*

Under this line of analysis, the court must determine whether Lipscomb is so pervasively sectarian that the tax-exempt bond issue had the primary effect of promoting religion. To make this determination, "it is necessary to paint a general picture of the institution, composed of many elements." *Roemer*, 426 U.S. at 758, 96 S.Ct. at 2350. The court must consider

---

**11.** The Fourth Circuit overturned a lower court ruling that granted summary judgment in favor of Maryland officials who denied a grant to a four-year college affiliated with the Seventh Day Adventist Church. The Fourth Circuit found that, because the lower court in that case viewed ambiguous facts in a light least favorable to the non-moving party, there was a factual question as to whether the college was pervasively sectarian. It remanded the case for further proceedings to determine whether it was a pervasively sectarian institution and reiterated the lower court's finding that, if it was found to be pervasively sectari-

an, it would be ineligible for the funds. *Columbia Union College*, 159 F.3d at 164. The case was appealed to the Supreme Court, which denied *certiorari*. But in a precursor to his plurality opinion in *Mitchell*, Justice Thomas dissented from the denial of *certiorari*, stating, "We should take this opportunity to scrap the 'pervasively sectarian' test and reaffirm that the Constitution requires, at a minimum, neutrality not hostility toward religion." *Columbia Union College v. Clark*, 527 U.S. 1013, 119 S.Ct. 2357, 144 L.Ed.2d 252 (1999).

the character and purposes of Lipscomb, the nature of the tax-exempt bonds, the relationship between Metro and the Churches of Christ, and the message that was delivered when tax-exempt bonds were used to improve Lipscomb's facilities. In doing so, the court will consider the following "pervasively sectarian factors" suggested by the plaintiffs and culled from the relevant case law:

1. Whether the school adheres to the American Association of University Professors ("AAUP") Statement of Principles on Academic Freedom.

2. Whether the school is sponsored by a religious organization or church.

3. Whether the school teaches religious doctrine in its programs.

4. Whether institutional documents state religious restrictions on what can be taught.

5. Whether the board of trustees is elected by the church.

6. Whether the church approves certain financial transactions.

7. Whether a majority of students—or a percentage greater than the population in that area—are members of the church.

8. Whether religion or theology classes are required.

9. Whether classes begin with prayer.

10. Whether admissions are restricted based upon the applicant's religion.

11. Whether attendance is required at religious activities.

12. Whether obedience to the doctrine and dogmas of the faith are compelled.

13. Whether the school takes other actions to attempt to propagate a particular religion.

*c.  Application of Pervasively Sectarian Test to Lipscomb*

██ In this case, evidence of the pervasively sectarian nature of Lipscomb is much stronger than that presented in *Hunt, Tilton, Roemer* or even *Columbia Union College,*[12] and nearly all of these factors militate toward finding Lipscomb to be a pervasively sectarian institution.

The land on which the construction projects funded by the bond proceeds were undertaken is subject to restrictive covenants that require that the property be used exclusively to further the religious mission of the institution so long as the property is owned by Lipscomb. (Docket No. 268, para. 6)

The following policies are included in Lipscomb's corporate charter and bylaws of the Board of Directors:

1. The corporation was organized *for the purpose of teaching the word of God* and the various branches of useful knowledge, commonly taught in institutions of learning for the following general purpose: the support of any literary or scientific undertaking as a college or university with the power to confer degrees of academy, a debating team lyceum, the establishment of a library, the support of a historical society, the promotion of painting, music and the fine arts, the support of the Board of Trade or Chamber of Commerce or other objects of like nature, *the support of public worship, the building of churches and chapels and the maintenance of missionary undertakings.*

(Docket No. 268, para. 56(a))(emphasis added)

2. Each director must be a member of the Church of Christ in good standing in the congregation of which he or she is a member.

(Docket No. 268, para. 56(b)(1))

3. The president of David Lipscomb University is its chief executive officer

---

**12.**  Unlike the district court in *Columbia Union College,* this court is considering only facts that the defendants do not dispute and

viewing them in a light most favorable to the non-moving party.

with the general supervision of its business and Christian educational affairs. He has three principal duties: Christian education, public relations and financial.

(Docket No. 268, para. 56(b)(3))

4. The president, with the assistance of vice presidents and the principals *shall maintain a Christian college that shall perpetuate the high Christian ideals* as inaugurated by Harding and Lipscomb, the founders of David Lipscomb College *in which the Bible is made the book of most importance,* and shall maintain as nearly as possible such educational standards as may be adopted by the State of Tennessee, and of such accrediting agencies as may exist in the area in which David Lipscomb College is located.

(Docket No. 268, para. 56(b)(4))(emphasis added)

5. [The President] shall teach or cause to be taught Bible every school day to every student enrolled. The Bible shall be taught by teachers who are sound in the faith and faithful in their lives to its sacred truths.

(Docket No. 268, para. 56(b)(5))

6. The Vice President for Institutional Planning shall organize and direct a program of public relations aimed in particular in obtaining the good will and support of Churches of Christ, alumni and the general community.

(Docket No. 268, para. 56(b)(7))

7. All personnel of David Lipscomb College, other than through its services

and buildings and grounds [departments], shall be members in good standing of the Churches of Christ.

(Docket No. 268, para. 56(b)(8))

Lipscomb admits that the school does not adhere to the AAUP Statement of Principles on Academic Freedom.[13] (Docket No. 268, para. 60) The Faculty Handbook states:

Each member of the Lipscomb faculty is committed both by personal conviction and by contract to the purposes and ideals of the institution as set forth by the founders and Board of Directors. *Within this framework* each teacher is free to pursue and teach truth in his/her respective field of learning. *Since truth is consistent everywhere,* this basic commitment makes possible academic freedom without the necessity of a formal statement.

(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 17) (emphasis added) This claim of academic freedom is a far cry from the AAUP Statement:

a. Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

b. Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject.[14] Limitations of academic free-

---

13. For reasons that do not appear of record, Lipscomb claimed that it did subscribe to the AAUP's Statement both in the Closing Certificate of the University in the 1991 Bond Re–Issue, (Docket No. 13, attach. Ex. 6, para. 18(c)), and in the Official Statement released in conjunction with the Bond Re–Issue, (Docket No. 1, attach. Ex. D at 21).

14. The 1970 Interpretive Comments to the 1940 Statement added the following note:
The intent of this statement is not to discourage what is 'controversial.' Controversy is at the heart of the free academic inquiry which the entire statement is designed to foster. The passage serves to underscore the need for teachers to avoid persistently intruding material which has no relation to their subject.

dom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment.[15]

c. College and university teachers are citizens, members of a learned profession, and officers of an educational institution. When they speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations. As scholars and educational officers, they should remember that the public may judge their institution by their utterances. Hence they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution.

(Docket No. 259, attach. Ex. B at 1)

The religious orientation of Lipscomb is driven home to the faculty in the Faculty Handbook:

The heart of each day's activities at David Lipscomb University is the chapel service. It is here that the entire Lipscomb family gains strength and inspiration for the tasks of the day. *Since attendance at chapel is compulsory for all students, it is expected that each faculty member will attend chapel regularly.* No arrangements should be made which require regular Chapel absences of one or more times each week without prior written approval of the Dean.

(Docket No. 259, attach. Ex. B at 2)

**15.** The 1970 Interpretive Comments to the 1940 Statement added the following note:

Most church-related institutions no longer need or desire the departure from the principle of academic freedom implied in the 1940 *Statement,* and we do not now endorse such a departure.
(Docket No. 259, attach. Ex. B at 2)

**16.** The Faculty Handbook greatly emphasizes the role of religion in the daily life and aca-

*Id.* at 28 (emphasis in original). Lipscomb President Harold Hazelip stated in his deposition that, while this last policy is not enforced, faculty members are expected to attend chapel every day. (Docket No. 209, Deposition of Harold Hazelip, at 100) The Faculty Handbook also states that it is Lipscomb's mission "to serve its students so that they may master knowledge and skills appropriate to them and become Christlike in attitude and behavior." (App. C; Docket No. 209, Deposition of Harold Hazelip, attach., Ex. 26(A) at 1) [16]

At the administrative and faculty level, all members of Lipscomb's Board of Directors are required to be in good standing with the Churches of Christ, and all members of Lipscomb faculty and staff, with the exception of food services and grounds maintenance, must be members of the Churches of Christ. In addition, Lipscomb's published policies require its faculty to attend Church of Christ religious services several times each week and subscribe to Church of Christ doctrine as delineated in Lipscomb's policies. Former Dean of Lipscomb, Norman Parks, outlined some of the beliefs required of Lipscomb faculty in a letter to Mayor Boner *opposing* the bond issue:

No person can be employed at Lipscomb who is not a member of the mainline Church of Christ. He cannot be a premillennialist or believe that instrumental music is acceptable for worship of God. He must believe that a divorced person cannot remarry and continue in church. He must believe that a woman cannot teach a class in religion to men.[17]

demic pursuits of Lipscomb. Several portions of the Handbook containing these statements are reproduced in the Appendices to this opinion. *See* Apps. B–E.

**17.** The court has not found any written policy stating that women are not allowed to teach courses in religion to male students. The excerpt from the Fall 1990 Class Schedule provided by the plaintiffs does support this statement, however. Of the 77 classes offered that semester by the Bible Department, only one course lists a female instructor. (Docket

(App. A; Docket No. 206, Deposition of William Hill Boner, attach. Ex. 6) While recognizing that "there are divorces accepted by churches of Christ," Lipscomb specifically states that it will not employ divorced persons on the faculty, because "we [the university] also believe that God never planned divorce as the best situation for any Christian." (App. D; Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 61)

Moreover, all faculty members at Lipscomb are contractually bound to support the academic and religious policies of Lipscomb as announced by the Board of Directors or the Administration.[18] The 1989–90 Faculty Handbook, portions of which are appended to this opinion, applies to all faculty and staff members, not merely to members of the Bible Department. The handbook clearly shows that every member of Lipscomb's faculty is expected to be committed to the religious beliefs and religious mission of Lipscomb, in all classes, and at all times. See App. B–E. If a faculty member were to join a church that was not a Church of Christ, it would be considered by Lipscomb as grounds for termination of his or her employment contract. (Docket No. 209, Deposition of Harold Hazelip, at 103) Lipscomb reserves the right to discriminate under Title VII of the Civil Rights Act of 1964 (as amended) against faculty or students "where it is necessitated by the specific religious tenets

held by the institution." (Docket No. 268, para. 56(i))

Seventy-seven percent of the students at Lipscomb were affiliated with the Churches of Christ at the time the bonds were issued. (Docket No. 268, para. 56(p); Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 14 at 48; id. Ex. 15 at 44) In an admissions brochure for prospective students, Lipscomb states that "[o]ne common thread that binds students together is their commitment to Christ. At Lipscomb, a student's love for the Lord is strengthened by this special association with other students, the majority of whom share the same spiritual values." (App. F; Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 25) Two of the ways in which the "spiritual emphasis of Lipscomb" is promoted among the faculty and students are through the Bible classes and chapel services offered daily, which every full-time student attending classes must attend and which faculty are encouraged to attend. See id.

Every Lipscomb student unofficially majors in Bible and all students are required to take one class in the Bible every day of every semester. Failing a Bible course results in a student's being placed on "Bible probation." (Docket No. 202 at 7–8) Students who do not pass every Bible course carried during the semester of probation are dropped from the school. (Docket No. 209, Deposition of Harold Hazelip, at 38) From 1990 until 1992, approxi-

No. 1, attach. Ex. G, attach. Ex. 15) This course is abbreviated as "BT: Ruth, Est, Lame—Wom," and is listed as being taught by Carolyn Baker, a part-time faculty member in the Bible Department. See id. The "Wom" listing is unique to this course and may well indicate, as the plaintiffs imply, that the class is limited to women.

**18.** The 1989–90 Faculty Handbook states:
Through the years some basic conditions and commitments have distinguished David Lipscomb University from many other institutions. A prerequisite for membership on the faculty is loyalty to New Testament Christianity as understood and traditionally practiced among churches of Christ. This

includes complete and unwavering acceptance of the Bible as the divinely inspired word of God; faithfulness in personal life to those ideals and habits which contribute to purity and opposition to the various forms of worldliness; and active participation in the work of a local congregation. Acceptance of a position on the faculty is considered a commitment to these principles. Opposition to them either in teaching, personal life, or influence would have to be judged a violation of the contract between a teacher and the university. A clause to that effect is inserted in the contract of every teacher.
(App. B; Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 5)

mately 100 undergraduate students were placed on Bible probation. (Docket No. 268, para. 56(e))

Although theology courses are commonly offered and/or required at liberal arts institutions, the Bible classes offered and required at Lipscomb are somewhat unique. In *Tilton,* the Court found that the theology courses taught at the challenged institutions in that case were

> taught according to the academic requirements of the subject matter and the teacher's concept of professional standards. The parties also stipulated that the courses covered a range of human religious experiences and are not limited to courses about the Roman Catholic religion. The schools introduced evidence that they made no attempt to indoctrinate students or to proselytize. Indeed, some of the required theology courses at Albertus Magnus and Sacred Heart are taught by rabbis.

*Tilton,* 403 U.S. at 686–87, 91 S.Ct. at 2100; *see also Roemer,* 426 U.S. at 751, 756 n. 20, 96 S.Ct. at 2347, 2349 n. 20. At Lipscomb, the religion classes are Bible classes, not theology classes. This is significant because "David Lipscomb University is not ... merely an institution which requires every student to take a lesson in the Bible each day; this study is the wellspring from which the university issued." (App. C; Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 1)

The Bible, as taught in the Bible classes, is viewed as "the revealed will of God to man and as the *only and sufficient rule of faith and practice.*" *See id.* (emphasis added). There are more classes offered each semester in the Bible department than in any other department, even though only a small percentage of the students officially major in Bible. (Docket No. 263, Aff. W. Craig Bledsoe, para. 11 (attached charts)) In the 1990–91 Bulletin, Lipscomb outlines the general education requirements. (Docket No. 1, attach. Ex. B at

30) Under the daily Bible requirement, Lipscomb states:

> Although the daily Bible requirement is important enough to be listed as a separate part of each student's academic program, it is also considered an *integral part of the general education program at David Lipscomb University. No body of knowledge or study of any kind is as important as the study of the Bible itself.*

*Id.* (emphasis added). In meeting the Bible requirement at Lipscomb, each student must take at least one course from each of four categories: The Gospels, The Church, Old Testament, and Defense of the Faith. *See id.* These classes, taught only by members of the Churches of Christ, are not the broad, encompassing theology classes of *Tilton;* instead, they "not only teach more about God's will but also give each student the opportunity to develop his or her own personal relationship with the Lord." (App.F)

Every full-time Lipscomb student is also required to attend chapel every school day, where attendance records are carefully maintained and missing worship services may lead to "chapel probation." (Docket No. 268, para. 56(g); Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 16 at 25) From 1990 until 1992, 40 to 60 students were on chapel probation each semester. (Docket No. 268, para. 56(h)) As explained in Lipscomb's admissions brochure, the chapel services are "where faculty and students assemble for a few minutes each day to sing praises to God and study the Bible." (App.F)

In all aspects, student life is guided by the religious principles of the school. (Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 16 at 35) Lipscomb prohibits students from dancing, consuming alcohol, and using tobacco products of any kind, all of which are considered types of conduct that do not conform to the standards of a Christian institution. (Docket No. 268, para. 56(k)) There is no visitation in the dormitories by members of the op-

posite sex other than during "official open-houses," and the students must conform to a strict dress code as outlined in the Handbook. (Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 16 at 39–40) These rules also extend beyond Lipscomb's grounds, as the Student Handbook states: "Students are not to be present at any establishment or event at which the principal purpose is known to be the sale and/or consumption of alcoholic beverages or dancing. Misconduct, regardless of where it takes place, which brings discredit upon the university will subject the student to strict disciplinary action." *Id.* at 37. Lipscomb encourages students to attend regular church services and provides lists of local churches—but only Churches of Christ churches—to its students. (Docket No. 268, para. 56(1))

The Bulletin [19] for Lipscomb students provides:

The Bible has always been considered the most important area of study for all students at David Lipscomb University. The founders, and those who have followed them, have held it to be important that every student study the Bible. Whatever their major interest of life work, a thorough knowledge of Biblical principles is needed.

In daily classes, Bible is taught as the inspired word of God. Students are encouraged to apply the Bible principles of right living to all aspects of personal and professional life.

(Docket No. 268, para. 56(*o*)) The Bulletin, quoting an original mission statement issued by its founders, also states:

The supreme purpose of the school shall be to teach the Bible as the revealed will of God to man, and as the only and sufficient rule of faith and practice.

And to train those who attend in pure Bible Christianity, excluding from the faith all opinions and philosophies of men. And from the work and worship of the church of God, all human inventions and devices.

Such other branches of learning may be added as will aid in the understanding and teaching of the scriptures, and as will promote usefulness and good citizenship among men.

(Docket No. 209, Deposition of Harold Hazelip, at 60) Hazelip testified that the statement has not been revoked, but that in modern mission statements, Lipscomb has "broadened and amplified" the description of its mission. (Docket No. 209, Deposition of Harold Hazelip, at 61)

The evidence presented in the depositions and literature of Lipscomb shows that, while Lipscomb may effectively teach a wide variety of secular courses, the central mission of the school is to inculcate and promote Churches of Christ doctrine as the true word of God.[20] Students are taught entirely by Churches of Christ members; are informed of the importance of the Bible in all areas of their lives; are expected to attend Bible courses and chapel on a daily basis and surrounded by an environment thoroughly saturated by Churches of Christ doctrine. The school does not follow the Statement of Principles on Academic Freedom of the AAUP, and the section of the faculty handbook dealing with research states that the primary aim of every instructor should be to give superior academic instruction, emphasizing daily instruction in the Bible. Lipscomb's Board of Directors, which controls all major decisions of the school, contains only members of the Church of Christ. (*See*

19. The Bulletin that was used in the deposition of Hazelip was from 1988–89, rather than the 1990–92 period covered by this lawsuit. However, Hazelip agreed that it remained largely unchanged and, where there were changes, Hazelip made note of those changes. (Docket No. 209, Deposition of Harold Hazelip, at 57–73)

20. *See* Appendices to this opinion for excerpts of Lipscomb's own statements regarding the importance and prevalence of religious life at the university.

*also* App. B; Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 6) Christian education is one of the three principal duties of the president of the school. In this environment, the chance that religion "would seep into the teaching of secular subjects," as discussed in *Roemer*, 426 U.S. at 751, 96 S.Ct. at 2347, seems inevitable.

In response, the defendants assert that Lipscomb offers a good education and graduates students with degrees in 76 different majors. (Docket No. 263, Aff. W. Craig Bledsoe, para. 10) Lipscomb is accredited by numerous higher education accrediting agencies, *id.* at para. 9,[21] including the Commission on Colleges of the Southern Association of Colleges and Schools, which is the exclusive regional accrediting body for eleven southern states and Latin America. *Id.* at para. 7. Lipscomb asserts that the high academic standards and high-quality students the school graduates justify Metro's approval of the bonds and provide a basis for Metro's legitimate, legislative purpose. However, Lipscomb's academic integrity is beside the point. If the religious mission of Lipscomb is so intertwined with the academic goals that they cannot be separated, no matter what worthwhile projects the tax-free bonds financed, they were state support for Lipscomb's religious message. Metropolitan Government cannot support or promote religion—any religion—and be in conformity with the First Amendment.

### d. Defendants' Arguments in Response to Use of Pervasively Sectarian Test :

### i. Nature of Tax–Exempt Bond Issue

■ Defendants Lipscomb and Metro assert that, even if the court finds that Lipscomb is pervasively sectarian, there has been no First Amendment violation because the bonds were not a direct benefit to the school from the government. There are a number of different arguments within this assertion: (1) the benefit does not come from the government; (2) the benefit does not go to the school; and (3) any benefit Lipscomb does receive is incidental. Each of these arguments fails under the facts of this case and under the law.

Before considering the different issues raised by the defendants in regard to the nature of the governmental aid, it is necessary to briefly outline the form and structure of a typical municipal bond issue under the Tennessee statutory scheme. *See* Tenn. Code Ann. § 7–53–101 *et seq.* (1985). The statute provides a system for local governments to encourage business, industry, and education through offering development loans at a reduced cost. *See id.* The governments are able to obtain the funds to offer these low-interest loans by issuing tax-exempt municipal bonds. *See id.* In theory, there are three significant parties in this transaction: the municipal Authority issuing the bonds, the Bond Purchasers, and the Entity seeking low-interest government financing. The Entity seeks a low-interest loan from the Authority in order to fund development in the area. The Authority issues tax-free revenue bonds on the bond market, and they are purchased by the Bond Purchasers. Until the bonds mature, the Bond Purchasers accrue interest on the bonds. When the bonds mature, the Bond Purchasers redeem them with the Authority for their face value. The interest rate on the tax-free bonds is able to be lower than the rate on taxable bonds because the Bond Purchasers are getting the additional value of tax-exempt interest. The Authority takes the money from the bond sale and loans it to the Entity. The interest rate on the loan is lower than that avail-

---

21. Many of these accreditations have come in the last several years, and the plaintiffs have submitted a Motion to Strike portions of the affidavit that discuss changes at Lipscomb since the bonds were issued. (Docket No. 254) This motion will be denied. In determining whether the primary mission of Lipscomb is to inculcate religious doctrine, the court cannot ignore evidence of efforts to improve the school's academic standing.

able through private bank financing because the Authority is able to pay a lower interest return rate on the bonds to the Bond Purchasers. The Entity uses the loan proceeds for projects and repays the loan plus interest over the same time period as the life of the bonds. The Authority uses the money repaid by the Entity to pay the interest on the bonds and to redeem the bonds at face value when they mature.

In reality, the government Authority issuing the bonds does not involve itself in all the financial details of the transaction. Instead, the Authority arranges to borrow the bond proceed amount from a bank at the time of the bond issuance. The Authority names the bank as trustee of the bond issue, and the bank disperses the money "borrowed" by the Authority to the Entity. In return, the Authority assigns its interest in the loan to the Entity to the bank, so that the Entity is repaying the bank directly. The bank markets the municipal bonds, reimbursing itself the money already advanced to the government and loaned to the Entity. The Entity repays the bank, and the bank repays the Bond Purchasers when their bonds mature.

This is the basic scenario of the bond transaction in this case. Lipscomb approached the Board, an instrumentality of Metro, in order to seek a low-interest development loan from the proceeds on a tax-free bond issuance. (Docket No. 1, attach. Ex. F(F); Docket No. 13, attach. Ex. 12) Sovran Bank acted as the trustee and advanced the money to the Board. (Docket No. 13, attach. Ex. 10) This agreement is laid out in detail in the Indenture signed by the Board and by Sovran Bank. *See id.; see also* Docket No. 13, attach. Ex. 3(C). In return for the advance, the Board assigned its interest in the loan agreement between the Board and Lipscomb to Sovran Bank. (Docket No. 13, attach. Ex. 3(C); *id.,* attach. Ex. 12) As a result, the money involved in the Lipscomb loan came from Sovran Bank and was repaid to Sovran Bank, but it was still a loan from the Board and, hence, from Metro.

### ii. Source of Benefit

The defendants' first argument is that the benefit Lipscomb received did not come from the government but from the Bond Purchasers who purchased the tax-exempt revenue bonds. This is incorrect for a number of reasons. The Loan Agreement is clearly between the Industrial Development Board and David Lipscomb University. (Docket No. 13, attach. Ex. 12) The municipal bond issue was simply the financing tool through which the government was able to collect funds sufficient to meet the $15,000,000 agreed to in the loan. To say that the benefit comes from private investors rather than from the government is also to ignore the fact that Lipscomb intentionally sought government financing instead of private financing. The benefit that Lipscomb received in doing so was a lower interest rate on its loan. Lipscomb went to the Board in order to get a low-interest government loan, and that is exactly what it received.

### iii. Beneficiary of the Bond Issue

Second, Metro makes the assertion that "the true beneficiaries of tax exemption are the bond holders and not Lipscomb University," and that, as a result, this is not aid to the university in violation of the Establishment Clause. (Docket No. 219 at 5) Although the bond holders did benefit financially from the tax-exempt nature of the municipal bonds, that is not the only benefit that accrued in this case. In *Hunt,* the Court examined a similar transaction and found that the aided institution clearly benefitted from the tax-exempt status of the bonds: "The income-tax-exempt status of the interest enables the Authority, as an instrumentality of the State, to market the bonds at a significantly lower rate of interest than the educational institution would be forced to pay if it borrowed the money by conventional private financing." 413 U.S. at 739, 93 S.Ct. at 2872. Lipscomb

has repeatedly stated that it received a substantial benefit from the tax-exempt bonds—some 30 percent of the cost of the project—and that it could not have completed the project if it had not been granted the benefit from Metro. *See, e.g.,* Docket No. 260 at 11 n. 7. It was Lipscomb, not some distant bond purchasers, who went to the Board to seek approval and it was Lipscomb that was granted approval by the Board and Metro's elected Mayor. There can be no question but that Lipscomb was benefitted, and this benefit was not attenuated by the fact that investors were able to share in it.

The form of aid provided to Lipscomb was a substantial, affirmative benefit that, unlike property tax exemptions, allowed Lipscomb to dramatically improve its facilities. Lipscomb improved not only its academic facilities, but the recreational facilities that would make the school more attractive to potential students. Students may only take advantage of these benefits if they agree to abide by the Churches of Christ aspects of the institution. This is a far cry from receiving bus fare to transport a student to the institution of his or her choice.

According to the undisputed facts, in 1989–90, improving the library facilities and student center were high priorities for Lipscomb. (Docket No. 268, para. 19) The Southern Association of Colleges and Schools (S.A.C.S.) had recommended improving Lipscomb's library and recreational facilities, and such an expansion was part of Lipscomb's strategic plan to increase its enrollment from 2,250 to 3,000 students. (Docket No. 268, paras. 19–20) [22]

At that same time, donations to Lipscomb were down 10 percent and student enrollment had dropped 8 percent. (Docket No. 268, paras. 21–22) Lipscomb saved an estimated 30 percent of the interest it would have cost to find alternative financing for the construction projects and cannot say what projects would have gone unfunded if it had not received the tax-free bonds. (Docket No. 268, paras. 24–25) With the tax-free bonds, Lipscomb was able to fully fund construction projects that included work on the library, intramural sports building and field, parking lots, landscaping, computer mainframe, baseball stadium, tennis courts, fiber optics network, a pedestrian way, and renovation of the administration and business school buildings. (Docket No. 268, para. 25)

Unlike the cases in which textbooks, teachers or teaching materials were either loaned to schools or provided to the students, Lipscomb received a flow of funds into its coffers provided by a loan from the Board. These funds did not merely supplement the teaching of secular subjects at Lipscomb; they were central to the school's stated goal of increasing enrollment. If Lipscomb's mission is to promote Churches of Christ doctrine, then Metro, through the Board, provided aid to promote Churches of Christ doctrine.

### iv. Direct v. Indirect Benefit

Finally, the defendants argue that the benefit was not a direct benefit and, as a result, the *Tilton–Roemer* line of cases is inapplicable. According to the defendants, "[t]he benefit realized by Lipscomb from the government's action is the indirect, incidental benefit of a lower interest rate

---

**22.** In fact, a brochure entitled "Questions and Answers" related to Lipscomb's "A Century of Vision" fund drive indicated that these improvements were required by the S.A.C.S. The brochure included the following:

    10. Why are the Library and Student Activities Center the top priorities?
        The Commission on Colleges of the Southern Association of Colleges and

Schools, which is our accrediting association, has mandated that we build these two structures in order to maintain our accreditation.
(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 34) Lipscomb has since denied that the construction was required. (Docket No. 268, para. 19)

on its indebtedness resulting from the indirect benefit bondholders realize from the tax exemption on the interest income they realize from the bonds." (Docket No. 194 at 7) Because neither Metro nor the Board can be held responsible for the debt, the benefit must be classified as indirect, Lipscomb asserts.

To support this assertion, the defendants rely upon *Everson; Board of Ed. v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); *Witters v. Washington Dep't of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846, (1986); *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988); *Zobrest; Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); and *Agostini.* The defendants assert that in "virtually every one of these cases, the governmental benefit to religious or sectarian schools was more direct than the benefit realized by Lipscomb in our case; and in virtually every one of these cases there was a closer 'nexus' between the State and a religious institution than could possibly exist in our case." (Docket No. 194 at 9)

There is no single, clear definition of "direct benefit" to control this analysis, either in any of these cases or in any other controlling cases the court can find. Not one of those cases discusses an indirect benefit as one that does not draw funds directly from the public coffer. Instead, the Court considered the government action involved in determining the recipient of the benefit, the method of payment and the form of aid. No government decision-making was involved in providing the benefit to pervasively sectarian institutions in any of those cases—either because the institution was not pervasively sectarian or because the benefit went to a third party rather than to the institution.

In deciding that the aid in this case is a direct benefit from the government to Lipscomb, the court relies on precedent as well as on the facts of this bond issue. In *Hunt v. McNair,* the Supreme Court considered a tax-exempt revenue bond issue very similar to the bond issue in this case. *See* 413 U.S. at 735–37, 93 S.Ct. at 2870–71. The Court refrained from deciding whether the benefit was direct or indirect:

> The 'state aid' involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or by loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available. The Supreme Court of New Jersey characterized the assistance rendered an educational institution under an act generally similar to the South Carolina Act as merely being a 'governmental service.' The South Carolina Supreme Court, in the opinion below, described the role of the State as that of a 'mere conduit.' Because we conclude that the primary effect of the assistance afforded here is neither to advance nor to inhibit religion under *Lemon* and *Tilton,* we need not decide whether, as appellees argue, the importance of the tax exemption in the South Carolina scheme brings the present case under *Walz v. Tax Comm'n,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), where this Court upheld a local property tax exemption which included religious institutions.

*Id.,* at 745 n. 7, 93 S.Ct. at 2875 n. 7 (internal citations omitted). In cases since *Hunt,* however, the Court has implicitly

recognized the bond proceed loan structure in that case as an example of direct state aid. *See Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 842, 115 S.Ct. 2510, 2523, 132 L.Ed.2d 700 (1995) (citing *Hunt* as one of the cases correctly cited by the Court of Appeals as establishing "the principle that we have recognized special Establishment Clause dangers where the government makes direct money payments to sectarian institutions"); *see also Mitchell,* 530 U.S. at ——, 120 S.Ct. at 2546 (plurality opinion) (citing *Rosenberger* and the cases collected therein); *id.,* 530 U.S. at —— – ——, 120 S.Ct. at 2559–60 (O'Connor, J., concurring in the judgment) (same).

Although the Court did not decide in *Hunt* whether the loan of municipal bond proceeds constituted a direct benefit, both later cases and the structure of the agreement between the government and the entity receiving funding indicate that such an arrangement is, in fact, a direct benefit to the institution.[23] In addition, Lipscomb's counsel's own statements at oral argument support this finding. In attempting to differentiate a direct benefit from an indirect benefit, counsel offered the following definition: "How do you distinguish, how do you define direct versus indirect? And the definition, we believe, is that direct aid is a direct transfer of money or property either in the form of a grant or in the form of a loan from the government to the institution." (Oral Arg., May 10, 2000) Although the court does not specifically adopt this narrow definition, it, too, would support the court's finding that the aid provided in

this case was a direct benefit to Lipscomb. As discussed previously, the Loan Agreement was between the Board and Lipscomb. The money went directly to Lipscomb in the form of a loan from the Board, an instrumentality of Metro.

In spite of the numerous arguments offered by the defendants in attempts to restrict the definition of a direct benefit, it is clear that a direct benefit is precisely what Lipscomb received. The government chose to provide Lipscomb with low-interest financing through a loan agreement. The government obtained the funding for that loan by issuing tax-exempt municipal bonds and assigned the loan to Sovran Bank, but the loan still came from the Board and, hence, from Metro.

### v.  Other Defense Arguments

In addition to challenging the nature of the aid provided to Lipscomb, the defendants challenge the use of the pervasively sectarian test on the grounds that the standard to determine whether Lipscomb is pervasively sectarian is too vague for the court to properly apply it. The defendants also contend that to find for the plaintiffs on this issue would create entanglement problems because the court would be forced to go "trolling through" Lipscomb's religious beliefs, which the defendants assert *Mitchell* has declared unacceptable under the Establishment Clause. It would be within the *Mitchell* ruling, and generally more in keeping with the First Amendment, for the court to merely consider the neutrality of the statute and

---

23.  In a supplemental memorandum in support of summary judgment, (Docket No. 246), Lipscomb relies on the finding of a court in the Eastern District of Michigan that a loan of proceeds from a municipal bond issue is not a direct government benefit to a religious educational institution. *See Johnson v. Economic Dev. Corp.,* 64 F.Supp.2d 657, 667. The *Johnson* court stated:

The Court also finds it significant that the funds at issue in this case did not take the form of a grant or loan of tax-raised money. Instead, one hundred percent of the funds came from private investors . . . . The Oak-

land EDC served merely as a conduit—that is, defendant simply provided a means by which private investors could finance the project. Not a single penny of the funds came from any state, county, or municipal source, and no public entity has any obligation whatsoever in connection with the sale or purchase of these limited obligation bonds.

*Id.* The decision of a fellow district court is not binding on this court. For the reasons stated in this opinion, this court respectfully disagrees with the position of the *Johnson* court.

its even-handed application, the defendants assert. However, as noted above, no Establishment Clause analysis can be undertaken without considering the specific circumstances of the case and numerous factors—some of which may be vague and difficult to apply.

Finally, the defendants asserted during oral argument that, by applying these factors, the court may encourage religious schools to alter their teachings to qualify for state funds and would, therefore, be creating additional state entanglement with religion. The court finds this argument unpersuasive and illustrative of the problem created by a single-issue test such as the one the defendants propose. If this assertion were true, then any rejection of state sponsorship of religion would be encouraging religious institutions to alter their basic tenets. Denying a benefit to an institution that would use that benefit specifically to indoctrinate others with their religious message is not hostile to religion, it is just not supportive of that religion, which is precisely what the First Amendment demands of the state.

The pursuit of promoting a thoroughly Christian education makes Lipscomb an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in religious mission. Worship as proscribed by the Church of Christ is so much a part of daily life on Lipscomb's campus that it is completely intertwined and inseparable from the pursuit of academic excellence. The low-interest loan provided to Lipscomb from the government was a direct and substantial benefit to the school. As such, the government benefit bestowed upon Lipscomb sponsors the inculcation of the Churches of Christ doctrine and it violates the First Amendment's Establishment Clause.

### 3. Recent Cases of Aid to Public Schools

In their Motion for Summary Judgment, plaintiffs rely solely on the argument that Lipscomb is a pervasively sectarian institution. The defendants, as discussed above, argue that this is an improper approach. In light of the often-confusing nature of Establishment Clause jurisprudence and in order to guarantee that the issues of this case have been considered fully, the court will also examine the Lipscomb bond issue under the guidelines culled from the Court's decisions on government aid to religious schools in general.

In determining the effect of the government aid, the court is concerned with whether the aid results in governmental indoctrination, whether the recipients are chosen in reference to their religion, and whether the aid results in excessive entanglement between the government and religion. See Agostini, 521 U.S. at 234, 117 S.Ct. at 2016. In Agostini, one of the Court's most recent cases to discuss these issues, the Court found that cases in the past had generally "assessed a law's 'effect' by examining the character of the institutions benefitted (e.g. whether the religious institutions were 'predominantly religious'), and the nature of the aid that the State provided (e.g. whether it was neutral and nonideological)." Id., at 232, 117 S.Ct. at 2015 (internal citations omitted). The nature of the institution benefitted has already been examined in some detail, so the court will focus on the nature of the aid provided and on the limitations placed on that aid.

In the Court's most recent Establishment Clause decision, Mitchell v. Helms, Justice Thomas, writing for the plurality, found that, "If aid to schools, even 'direct aid,' is neutrally available and, before reaching or benefitting any religious school, first passes through the hands (literally or figuratively) of numerous private citizens who are free to direct the aid elsewhere, the government has not provided any 'support of religion.'" Mitchell v. Helms, 530 U.S. 793, 120 S.Ct. 2530, 2544, 147 L.Ed.2d 660 (2000) (plurality opinion) (quoting Witters v. Washington Dept. of Servs. for the Blind, 474 U.S. 481, 489, 106 S.Ct. 748, 752, 88 L.Ed.2d 846 (1986)).[24]

These two factors, the neutrality of the government aid and whether the aid was given directly to the institution or first went to private individuals, have become significant signposts in determining whether the government has advanced religion. *See Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 9–10, 113 S.Ct. 2462, 2467, 125 L.Ed.2d 1 (1993); *Witters*, 474 U.S. at 486–87, 106 S.Ct. at 751; *Mueller v. Allen*, 463 U.S. 388, 398–99, 103 S.Ct. 3062, 3068–69, 77 L.Ed.2d 721 (1983).

In addition to these two factors, the Court has also focused on whether the government aid is effectively limited to supporting only the secular interests of the religious institution. *See, e.g., Mueller*, 463 U.S. at 403, 103 S.Ct. at 3071; *Committee for Public Educ. and Religious Liberty v. Regan*, 444 U.S. 646, 653–57, 100 S.Ct. 840, 846–49, 63 L.Ed.2d 94 (1980). Where the aid can be limited to assisting only the secular functions of the school and there is adequate monitoring to ensure that this limitation is adhered to, then the Court has found that the government aid does not have the effect of advancing the religious interests of the school. *See Agostini*, 521 U.S. at 233–35, 117 S.Ct. at 2015–16.

In order to determine whether the aid offered to Lipscomb had the effect of advancing the religious beliefs of the institution, the court must consider whether the aid was neutrally available without regard to the religious nature of the school, whether the government or private individuals ultimately chose to offer the aid to Lipscomb, and whether there were adequate safeguards to ensure that the government aid would assist only the secular functions of the school. The court will address each issue in turn.

### a. Neutrality

As Justice Thomas, writing for the plurality, recently noted, "In distinguishing between indoctrination that is attributable to the State and indoctrination that is not, we have consistently turned to the principle of neutrality, upholding aid that is offered to a broad range of groups or persons without regard to their religion." *Mitchell v. Helms*, 530 U.S. at ——, 120 S.Ct. at 2541; *see also Rosenberger v. Rector and Visitors of the Univ. of Virginia*, 515 U.S. 819, 839, 115 S.Ct. 2510, 2521, 132 L.Ed.2d 700 (1995) ("We have held that the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.") (citing *Board of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 704, 114 S.Ct. 2481, 2491, 129 L.Ed.2d 546 (1994) (Souter, J.); *Witters v. Washington Dept. of Servs. for Blind*, 474 U.S. 481, 487–88, 106 S.Ct. 748, 751, 88 L.Ed.2d 846 (1986); *Mueller v. Allen*, 463 U.S. 388, 398–99, 103 S.Ct. 3062, 3069, 77 L.Ed.2d 721 (1983); *Widmar v. Vincent*, 454 U.S. 263, 274–75, 102 S.Ct. 269, 277, 70 L.Ed.2d 440 (1981)); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8, 113 S.Ct. 2462, 2466, 125 L.Ed.2d 1 (1993) ("[W]e have consistently held that government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are not readily subject to an Establishment Clause challenge just because sectarian institutions may also receive an attenuated financial benefit."); *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 746, 96 S.Ct. 2337, 2344, 49 L.Ed.2d 179 (1976) (finding that "religious institutions need not be quarantined from public benefits that are neu-

24. As Justice Thomas' comment indicates, the Court has also considered whether the aid is direct or indirect as a factor in determining whether government aid impermissibly advances religion. As that issue was considered in the previous section, it will not be addressed again. The aid provided to Lipscomb through the loan of the proceeds from the bond issue was direct government aid. *See supra*, Part C.I.(d)(iv).

trally available to all"); *Walz v. Tax Commission*, 397 U.S. 664, 676–77, 90 S.Ct. 1409, 1415, 25 L.Ed.2d 697 (1970) ("Few concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise ... this kind of benevolent neutrality toward churches ... so long as none was favored over others . . . .").

Although religious institutions are eligible to receive government aid under the neutrality principle, the Court has recognized that "the line between state neutrality to religion and state support of religion is not easy to locate." *Board of Educ. of Central Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 242, 88 S.Ct. 1923, 1926, 20 L.Ed.2d 1060 (1968). What the defendants advocate is a bright line Establishment Clause test that permits all government aid that appears neutral on its face. Such a simplistic approach is clearly inappropriate under the Establishment Clause, as Justice Blackmun, writing for the plurality, recognized in *Roemer:*

> The State must confine itself to secular objectives, and neither advance nor impede religious activity. Of course, that principle is more easily stated than applied. The Court has taken the view that a secular purpose and a facial neutrality may not be enough, if in fact the State is lending direct support to a religious activity. The State may not, for example, pay for what is actually a religious education, even though it purports to be paying for a secular one, and even though it makes its aid available to secular and religious institutions alike. The Court also has taken the view that the State's efforts to perform a secular task, and at the same time avoid aiding in the performance of a religious one, may not lead it into such an intimate relationship with religious authority that it appears either to be sponsoring or to be excessively interfering with that authority.

*Roemer*, 426 U.S. at 747–48, 96 S.Ct. at 2345 (plurality opinion). As *Roemer*

makes clear, then, in evaluating the neutrality of the government aid program, the court must look at both the facial neutrality of the statute and the manner in which the statute is applied in providing aid to specific groups. *See id.*, see also *Bowen v. Kendrick*, 487 U.S. 589, 609–10, 108 S.Ct. 2562, 2574, 101 L.Ed.2d 520 (1988) ("Of course, even when the challenged statute appears to be neutral on its face, we have always been careful to ensure that direct government aid to religiously affiliated institutions does not have the primary effect of advancing religion.").

In this case, the plaintiffs do not challenge the constitutionality of the industrial development board statute on its face. Instead, the plaintiffs attack only the decision by the Board to issue tax-free bonds and to loan the proceeds from those bonds to Lipscomb. There is no question that the statute is neutral on its face. The purpose of the statute authorizing the incorporation of local industrial development boards is explained in Tennessee statute § 7–53–102(a):

> It is the intent of the legislature by the passage of this chapter to authorize the incorporation in the several municipalities in this state of public corporations to finance, acquire, own, lease, and/or dispose of properties to the end that such corporations may be able to maintain and increase employment opportunities, increase the production of agricultural commodities, and increase the quantity of housing available in affected municipalities by promoting industry, trade, commerce, tourism and recreation, agriculture and housing construction by inducing by inducing manufacturing, industrial, governmental, educational, financial, service, commercial, recreational and agricultural enterprises to locate in or remain in this state and further the use and production of its agricultural products and natural resources, and to vest such corporations with all powers that may be

necessary to enable them to accomplish such purposes.

TENN. CODE ANN. § 7–53–102(a)(1985). This statute is in no way skewed toward or against religious institutions on its face, and the eligibility of an entity to apply for financial assistance from the Board is based on neutral criteria.

But the facial neutrality of the statute does not end the court's inquiry, because the court must also consider the neutrality exercised by the Industrial Development Board in issuing these bonds for the benefit of Lipscomb. That is a nearly impossible task in this case because so little evidence has been provided concerning the standards used by the Board and by the mayor in deciding to approve the Lipscomb bond issue. In his deposition, Mayor Boner recalled little of the decision-making process that he went through in deciding to approve the revenue bonds as tax-exempt. (Docket No. 206, Deposition of William Hill Boner, at 33, 38–39, 51–52) The transcripts of the public meetings and hearings held by the Board in relation to the bond issue and reissue do not provide any information regarding the standards used by the Board in approving the bond issue. (Docket No. 1, attach. Exs. F, G, I) [25] Based on this lack of evidence, the court cannot find, as a matter of law, that the decision to provide financial assistance to Lipscomb was made on a neutral basis. As a result, the court must rely on other factors to determine whether the defendants' actions advanced the religious beliefs of Lipscomb.

### b. Individual Choice

A second important factor to consider in determining whether the aid to Lipscomb had the impermissible effect of advancing religion is whether the aid was given to the religious institution at the discretion of the government or as the result of independent choices of private individuals. In recent years, the Court has found this factor to be of increasing significance, especially where the government aid goes to sectarian institutions. *See Agostini*, 521 U.S. 203, 225–26, 117 S.Ct. 1997, 2011–12, 138 L.Ed.2d 391 (citing *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993); *Witters v. Washington Dept. of Servs. for Blind*, 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); *Committee for Public Education and Religious Liberty v. Nyquist*, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973)). Where the government funds are provided to individuals who then decide to use those funds in support of religious education, the Court has found that there is no government support of religion. *See, e.g., Zobrest*, 509 U.S. at 8–10, 113 S.Ct. at 2466–67. Where the government funds are provided directly to the religious institutions without the intervening decisions of private individuals, the government support is more likely to be found to have the effect of advancing the religious purposes of the institution.

In this case, Lipscomb asserts that there was independent, individual, private choice involved in providing the benefit of the bond issue to Lipscomb. Lipscomb's argument relies on the fact that private investors purchased the bonds, the proceeds of

---

**25.** At the first public meeting, held on April 10, 1990, plaintiffs' counsel was present to voice concerns regarding the bond issue. (Docket No. 1, attach. Ex. F, Transcript of Public Meeting of April 10, 1990, at 6) At the close of the meeting, the Board voted unanimously to approve the bond issue, leaving the Establishment Clause issues to counsel to determine afterward. *See id.* at 11–15. At the first public hearing, held on April 16, 1990, the only representative of the Board present to hear from the public was Mr. Bobby Davis, the attorney for the Board. (Docket No. 1, attach. Ex. F, Transcript of Public Hearing of April 16, 1990, at 1) At the second public hearing, plaintiffs' counsel was not permitted to read into the record documents he had brought with him concerning the nature of Lipscomb but was allowed to submit them to the Board. (Docket No. 1, attach. Ex. G, Transcript of Public Hearing of May 30, 1990, at 18–19) At the close of the second hearing, the Board again voted to approve the bond issue. *See id.* at 52–53.

which were loaned to Lipscomb. This argument is without merit. Although the bonds were marketed to private investors, the Board, not the private investors, decided who would receive the benefit of the sale of the bonds. The private investors could not select which institution they wanted to receive the funds. They merely chose to invest in tax-free bonds. This is nothing like parents choosing to send their children to a parochial school. Such government selection is a drastic alteration of the implications that may be drawn from Metro's providing the benefit because, as Justice O'Connor noted, "[E]ndorsement of the religious message is reasonably attributed to the individuals who select the path of the aid." *Mitchell*, 530 U.S. at ——, 120 S.Ct. at 2559 (O'Connor, J., concurring in judgment). Clearly, the Board, and through it Metro, made the decision to issue bonds for the benefit of Lipscomb.

### c. Use Restricted to Secular Functions

There is one other factor that the Supreme Court has found significant in determining whether government aid to sectarian institutions has had the effect of advancing religion in violation of the Establishment Clause: whether there are sufficient restrictions and conditions on the aid to ensure that the government funds can be used to support only the secular, and not the sectarian, functions of the institution. *See Committee for Public Educ. and Religious Liberty v. Regan*, 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980) (finding that a statute did not violate the Establishment Clause because the statute properly limited the state aid to secular functions of religious schools); *Levitt v. Committee for Public Educ.*, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973) (invalidating a statute providing financial assistance to private schools for educational testing because there were not adequate safeguards in the statute to ensure that the funds would be used only for secular purposes); *Board of Educ. of Central Sch. Dist. No. 1 v. Allen*, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) (refusing to invalidate a state program that provided textbooks to all schools where books were chosen by public school authorities and religious books were not allowed to be approved).

The Court has found that sectarian institutions may receive government funding as long as the funds are used solely to advance the secular interests and purposes of those institutions. *See, e.g., Roemer*, 426 U.S. at 759, 96 S.Ct. at 2351. Evaluating government financing under this standard requires the court to consider the effectiveness of the statutory and contractual restrictions placed on the government assistance, as well as the oversight and enforcement provisions designed to ensure compliance. There must be clear legal limitations on the use of the government funds to ensure that the aided institutions neither can nor will use the funds to advance sectarian interests.

### i. Sufficiency of Procedural Mechanisms To Ensure Funds Advance Only Secular Purposes

Beyond ensuring that the initial use of the government funds did not support sectarian interests, the government must also provide adequate procedural safeguards to ensure that funds originally provided for secular purposes do not, over time, become directed toward the religious purposes of the institution. As the Court stated in *Nyquist*, "In the absence of an effective means of guaranteeing that the state aid derived from public funds will be used exclusively for secular, neutral, and nonideological purposes, it is clear from our cases that direct aid in whatever form is invalid." *Nyquist*, 413 U.S. at 780, 93 S.Ct. at 2969. Although the effectiveness of government restrictions must be determined on the facts of the individual case, prior decisions from the Court have established some helpful guidelines.

In *Tilton v. Richardson*, the Court considered a federal statute that offered grants and loans to educational institu-

tions. 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). The statute excluded any pervasively sectarian institutions from receiving aid and gave the United States a 20–year interest in any facilities built with federally-provided funds. *See id.*, at 675, 91 S.Ct. at 2094. During this period, the institutions were prohibited from using the facilities for "sectarian instruction, religious worship, or the programs of a divinity school," and the restriction was to be enforced through on-site inspections. *Id.* The Court invalidated this portion of the statute and Chief Justice Burger, writing for the plurality, found that:

> Limiting the prohibition for religious use of the structure to 20 years obviously opens the facility to use for any purpose at the end of that period. It cannot be assumed that a substantial structure has no value after that period and hence the unrestricted use of a valuable property is in effect a contribution of some value to a religious body. Congress did not base the 20–year provision on any contrary conclusion. If, at the end of the 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion
>
> To this extent the Act therefore trespasses on the Religion Clauses. The restrictive obligations of a recipient institution under s 751(a)(2) cannot, compatibly with the Religion Clauses, expire while the building has substantial value.

*Id.*, at 683, 91 S.Ct. at 2098 (plurality opinion).

In *Hunt v. McNair*, the Court considered a statute similar to that at issue in this case, where the Educational Facilities Authority of the state government ("Authority") issued tax-exempt bonds and loaned the proceeds to institutions of higher education. 413 U.S. 734, 735–36, 93 S.Ct. 2868, 2870–71, 37 L.Ed.2d 923 (1973). Under this program, the institution would convey to the Authority the land on which

the facilities funded by the loan would be built. *See id.*, at 738, 93 S.Ct. at 2871–72. The Authority would then lease the property back to the college during the repayment of the loan and would reconvey the property to the college once the loan was repaid. *See id.* The statute contained a provision that no funds could be used to support "any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination." *Id.*, at 736–37, 93 S.Ct. at 2871. In addition, the lease agreement between the Authority and the college contained a similar restriction, which could be enforced through inspections by the government. *See id.*, at 739, 93 S.Ct. at 2872. Finally, the reconveyance of the land to the college once the loan was repaid was also required to "contain a restriction against use for sectarian purposes." *Id.*, at 739–40 & n. 4, 93 S.Ct. at 2872 & n. 4. In considering the primary effect of the aid offered to particular schools, the Court found that these provisions were sufficient to ensure that the government aid would not be used to advance the religious purposes of the schools. *See id.*, at 743–44, 93 S.Ct. at 2874–75.

In *Roemer v. Board of Public Works of Maryland*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (plurality opinion), and in *Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), the Court reiterated the need for clear restrictions on the use of government funds by sectarian institutions and for sufficient enforcement provisions of those restrictions. In *Roemer*, the Court found that the requirement that government aid support only the secular functions of the school was satisfied "by the statutory prohibition against sectarian use, and by the administrative enforcement of that prohibition through the Council for Higher Education." 426 U.S. at 759, 96 S.Ct. at 2351. The administrative enforcement included

sworn affidavits from the institution's chief executive officer that the funds would not be used to support the institution's sectarian interests, separate accounts for state funds, documentation of the use of state funds, and inspection and audit rights to ensure proper use if the Council deemed such steps necessary. *See id.*, at 742–43, 96 S.Ct. at 2342–43. In *Bowen*, there were no explicit statutory restrictions on the use of government funds, but the Court found that the Act indicated that religious uses of the government funds were contrary to the intent of the legislation. *See Bowen*, 487 U.S. at 614–15, 108 S.Ct. at 2577. In addition, the Court found that the grantees were required to undergo evaluations before receiving funds, to make reports regarding the use of the funds, and to disclose the intended uses of the funds, which, taken together, provided a scheme sufficient to ensure that the government could prevent the funds from being used to support religion. *See id.*

Taken together, these cases establish that the government has a specific responsibility to ensure that any funding provided to religious institutions is never used to support the religious purposes of the institution. One of the primary ways the government can satisfy this requirement is through explicit restrictions on the use of the funds. Restrictive language, on its own, however, is not enough to meet the government's burden. The restrictions must be enforced in practice. · The state must also ensure that the restriction extends for the life of the facility or other project funded by the government funds and that there are sufficient enforcement mechanisms in place to guarantee that the funds are never used to support the sectarian interests of the institution.

In this case, the defendants argue that the Lipscomb bond issue meets the above standards because the government funds were used only to support the secular educational purposes of the school. The evidence is otherwise; there were neither sufficient restrictions nor adequate enforcement mechanisms. · In addition, even if Lipscomb used the funds in precisely the manner it stated it would, the government could not guarantee that the funds were being used solely for secular purposes. As a result, the government funds provided to Lipscomb through the low-interest government loan from the Board cannot be found, as a matter of law, to have been limited to supporting only the secular interests of the school.

The Loan Agreement between Lipscomb and the Board does contain a restrictive use provision. Section 5.3 on "Special Covenants" states:

> (s) The Borrower will not use the Project or any part thereof for sectarian instruction or as a place of religious worship or in connection with any part of the program of a school or department of divinity for any religious denomination or the training of ministers, priests, rabbis or other similar persons in the field of religion.

(Docket No. 13, attach. Ex. 12 at 18) Under the Survival Clause of the Agreement, this restrictive use clause "shall survive termination or expiration of this Loan Agreement," anticipated to be in 2020. (Docket No. 13, attach. Ex. 12 at 23) In addition, the other contracts relating to the loan between Lipscomb, the Board, and Sovran Bank contain provisions incorporating the conditions and restrictions of the Loan Agreement. (Docket No. 13, attach. Ex. 13 at 2; *id.*, attach. Ex. 14 at 23; *id.*, attach. Ex. 17 at 11)

On its face, the language of this restriction is similar to that used in restrictions the Supreme Court has found adequate in limiting the provision of government funds to secular activities. As the Court has recognized, however, restrictive language alone is not sufficient; there must also be adequate enforcement of this restriction. In this case, there are two distinct problems with the use restrictions. First, the procedural mechanisms for monitoring and enforcing the sectarian use restriction do not meet the standards established by the

Court. Second, the use restriction was not sufficient to ensure that the funds provided by the loan were not used to support the sectarian interests of the school.

One of the primary problems with the enforcement comes from the effectiveness of the Board in removing itself from the details of the financial transaction. First, the Board assigned its entire interest in the Loan Agreement to the Trustee, Sovran Bank, and it is the Loan Agreement that contained the use restriction provision. (Docket No. 13, attach. Ex. 12) Banks, of course, are not generally required to comply with the First Amendment in their financial transactions. Second, even within the language of the Loan Agreement, the government abdicated any responsibility for enforcing the use restriction. Under the terms of the Agreement, the entity responsible for monitoring Lipscomb's adherence to the terms of the loan agreement is the Trustee of the bonds and loan, Sovran Bank. (Docket No. 13, attach. Ex. 12 at 21) The provisions on violations of the loan agreement provide:

Section 6.1 *Event of Default Defined.* An Event of Default hereunder shall occur:

.    .    .    .    .

(b) If the Borrower shall fail to observe or perform any of its other covenants, conditions or agreements hereunder for a period of 30 days *after notice* (unless the Bank shall consent to an extension of such time prior to its expiration) *specifying such failure and requesting that it be remedied,* be given by the Issuer, the Bank or the Trustee to the Borrower.

.    .    .    .    .

Section 6.2 *Remedies on Default.* Upon the occurrence and continuation of an Event of Default, *the Trustee shall immediately notify the Bank and may* (except in a case of an Event of Default under Section 6.1(f), in which case the Trustee shall):

(a) *With the written consent of the Bank,* declare all payments under the Note and the Bonds to be immediately due and payable in an amount sufficient to pay all the principal of an premium, if any, and accrued interest on the Bonds, whereupon the same shall become immediately due and payable.

(b) *Take whatever action at law or in equity may appear necessary* or desirable to collect the amounts then due and thereafter to become due hereunder or *to enforce observance or performance of any covenant, condition or agreement of the Borrower* under the Borrower Documents.

(Docket No. 13, attach. Ex. 12 at 20–21) (emphasis added) Clearly, the bank is responsible for monitoring Lipscomb's use of the funds to ensure compliance with the terms of the agreements.[26] Perhaps more importantly, the bank is given discretion in choosing what action to take, if any, if Lipscomb does violate a condition of the Loan Agreement. Thus, the use restriction language may appear to be absolute, but the enforcement mechanisms are not designed to ensure that Lipscomb will be prevented from using the funds to advance its religious mission.

Finally, the Survival Clause is not sufficient to ensure that Lipscomb will never use the facilities built with the government funds for sectarian purposes. In *Tilton,* the Court invalidated the portion of a federal statute that limited the government's interest in the facilities constructed under

---

**26.** In the Letter of Credit Reimbursement Agreement entered into by Lipscomb and Sovran Bank, Lipscomb is required to provide financial documents at the close of each fiscal year. (Docket No. 13, attach. Ex. 14 at 17–18) In addition, both the Chief Financial Officer of Lipscomb and a "responsible officer" of Lipscomb are required to provide affidavits stating that there have been no events of default during the previous year. *See id.*

the grant to twenty years. In this case, Lipscomb has stated that the estimated useful life of the buildings constructed with the government loan is 40 years. (Docket No. 13, attach., Ex. 6(D–1)) Of the $15 million loaned to Lipscomb, the University intended to use $11 million on the construction and renovation of these buildings. *See id.* The loan is scheduled to be repaid by 2020, after only thirty years. (Docket No. 13, attach. Ex. 5) Thus, the majority of the funds were used to construct and to renovate buildings whose useful life was estimated to be ten years longer than the life of the loan. The bank's interest in enforcing the terms of the Agreement will expire when the loan is repaid and the buildings are only 30 years old. Thus, there is no mechanism for enforcing the use restriction for the last ten years of the useful life of the improvements, assuming that a 40–year useful life is an accurate and reasonable estimation. In effect, Metro is providing Lipscomb with a contribution equal to the value remaining in the buildings after the loan is repaid in 2020. This directly conflicts with the Court's mandate that all use restrictions must remain in effect for the life of the buildings constructed with government funds.

The language of the use restrictions in the Loan Agreement appears, on its face, to comply with the standards set out by the Court, but the mechanisms in place to monitor and to enforce those restrictions does not rise to the level of an absolute separation. As a result, the court finds that the contractual agreements between the government and Lipscomb do not contain restrictions sufficient to guarantee compliance with the Establishment Clause.

### ii. Use of Government Funds in Lipscomb's Stated Projects

The bond funds here were used in part to construct and equip a new library, to renovate and convert the old library into administrative offices, and to construct a new intramural athletics building ("or student activities center"), four new tennis courts, a new baseball stadium, an intramural field, and an addition to Lipscomb's Business Center. (Docket No. 197, Aff. Larry Cochran, para. 10) The evidence before the court indicates that many of these facilities may well be used, at least in part, to advance Lipscomb's religious mission.

The primary example of this mixed use is the new library constructed with government funds. People objecting to the bond issue pointed to the religious collections housed in Lipscomb's library and argued that providing financing for a new library would serve to advance the religious nature of Lipscomb. *See, e.g.,* App. A. While the court recognizes that a government-funded library may well contain a number of religious books without serving to advance religion in any way, there is a distinction between a library containing a general collection of religious materials as a small part of its collection and a library whose collection contains a substantial number of religious works which are largely dedicated to a particular faith. A former dean of Lipscomb, Norman L. Parks, objected to the government financing on precisely these grounds. In a letter to Metro Mayor Boner prior to the first bond issue in 1990, Dean Parks stated:

> The insistence that a library at Lipscomb is a purely secular enterprise is dishonest. Let me show you why. The Bible department enrolls every student at Lipscomb in a five-day [per week] Bible class throughout his four-year residence there. Any other department is a pygmy compared with this one. It follows that the library inescapably serve[s] the Bible department far more that it does any other department. Added to this is the fact that the Bible department offers a graduate degree in religion, the basis for the recent change in name from college to university. The library must house a vast collection of religion books to serve this graduate program. On top of that, plans for the library include special housing of a sec-

tion relating to the history of the Church of Christ in America to include periodicals, books, manuscripts, church records, and the like on the model of the Disciples of Christ Historical Library in Nashville. Finally, the library will not house journals of other denominations. (App. A; Docket No. 206, Deposition of William Hill Boner, attach. Ex. 6) As a former dean of Lipscomb and a non-party to this case, the court has no reason to doubt the veracity of Dean Parks' statements. In addition, the government funds were also used to "equip" Lipscomb's new library. "Equipping" the new library may well have involved the purchase of religious, perhaps even Church of Christ, literature, periodicals or other materials. *See* Docket No. 197, Aff. Larry Cochran, para. 10. Given these facts, the court must find that the use of government funds to construct a new library for Lipscomb advanced the religious teachings of the university.

Some of the bond loan funds also were used by Lipscomb to renovate the old library into administrative offices. Although the evidence does not contain a list of the current occupants of the new administration building, it is reasonable to infer that at least some whose offices are there are involved in the religious mission of the school. A number of the administrative offices have some responsibility for overseeing the daily Bible and chapel requirements and in hiring faculty members who adhere to the religious beliefs of Lipscomb. *See, e.g.,* Docket No. 209, attach., Ex. 16 at 8–9. It is entirely possible that administrative offices dealing with the various religious programs and requirements of Lipscomb are housed in the newly renovated administrative offices. *See* Docket No. 197, Aff. Larry Cochran, para. 10.

Faculty offices are located in numerous buildings around campus, including in the Burton Administration Building, in the old library, and in the Business Center, all of which were renovated or remodeled with the government loan. (Docket No. 209,

Deposition of Harold Hazelip, attach. Ex. 26(A) at iii-v) These faculty members, including members of the Bible Department, are expected to use their offices to meet with students and to serve as advisors to both majors in their respective departments and to undeclared majors. *See id.* at 17–18. The faculty members also serve on a number of committees that have some functions relating to the religious nature of the school, including the Graduate Academic Review Committee, the Academic Advisory Committee, the Student Life Committee, the Graduate Admissions Committee, and the Graduate Council. *See id.* at xii-xix. It is reasonable to assume that at least some of this work will take place in the faculty members' offices, which could very well be located in the renovated library, the new library, or the renovated business center.

Lipscomb is proud to be unique in its overwhelming dedication to religious teaching in every aspect of its educational, faculty, and student life. As a result, government funds provided to Lipscomb must be carefully restricted and monitored to ensure that they are not supporting the sectarian interests of the school. In this case, there are not adequate assurances that the funds provided did not assist the religious interests of the school. More importantly, the Board and Metro did not create sufficient contractual restrictions or monitoring mechanisms to limit Lipscomb's use of the buildings and other improvements financed by the government loan. The Supreme Court has allowed government funds to be directed to religious institutions, but only where the funds are used only to advance secular interests. Where, as in this case, the government has not provided effective limitations on the use of government funds, the court must find that the government's actions had the effect of advancing religion.

#### 4. *Endorsement Test*

In addition to the guidance provided by the lines of cases examining aid to universities and aid to schools generally, there

is one, final standard that the court will consider in determining whether the aid provided to Lipscomb constituted the impermissible advancement of religion in violation of the Establishment Clause: whether the government action conveys a message of endorsement of the religious activities of Lipscomb.[27] As the Court stated in *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* "In recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence." 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989) (plurality opinion, opinion of the Court, Part IIIA) (citing *Engel v. Vitale,* 370 U.S. 421, 436, 82 S.Ct. 1261, 1270, 8 L.Ed.2d 601 (1962)); *see also Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. 819, 841–42, 115 S.Ct. 2510, 2522–23, 132 L.Ed.2d 700 (1995); *Lee v. Weisman,* 505 U.S. 577, 627, 112 S.Ct. 2649, 2676, 120 L.Ed.2d 467 (1992)(Souter, J., concurring); *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 8–9, 109 S.Ct. 890, 896, 103 L.Ed.2d 1 (1989) (plurality opinion); *Edwards v. Aguillard,* 482 U.S. 578, 593, 107 S.Ct. 2573, 2582, 96 L.Ed.2d 510 (1987); *Wallace v. Jaffree,* 472 U.S. 38, 60, 105 S.Ct. 2479, 2491, 86 L.Ed.2d 29 (1985). In addition, the Sixth Circuit has specifically adopted the endorsement test for determining whether a government action has the impermissible effect of advancing religion. *See Brooks v. City of Oak Ridge,* 222 F.3d 259, 264 (6th Cir.2000) ("When evaluating the "effects" prong of the *Lemon* test, this court applies the endorsement test, which was embraced by the Supreme Court in *County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)."); *Americans United for Separation of Church and State v. City of Grand Rapids,* 980 F.2d 1538, 1543–44 (6th Cir.1992) (en banc).

Under the endorsement test, "[w]hat is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." *Lynch v. Donnelly,*

---

**27.** In its Opposition to Plaintiffs' Motion for Summary Judgment, Lipscomb asserts that the question of governmental endorsement is not properly before the court based on Judge Nixon's prior determination that the plaintiffs did not have standing to assert an Establishment Clause claim on this basis. (Docket No. 260 at 4) Lipscomb argues that this alleged finding is the law of the case and "should be dispositive of the governmental indoctrination issue." (Docket No. 260 at 9).

The court does not agree with Lipscomb's interpretations. The doctrine of the law of the case does not preclude the court from using the endorsement test in deciding the merits of the plaintiffs' claim. Judge Nixon's findings regarding standing do not apply to determinations on the merits of the case. The question of the plaintiffs' standing has been finally resolved. *Steele v. Industrial Dev. Bd. of Met. Gov't of Nashville and Davidson Co.,* 39 F.3d 1182 (6th Cir.1994), *cert. denied, David Lipscomb Univ. v. Steele,* 515 U.S. 1121, 115 S.Ct. 2275, 132 L.Ed.2d 279 (1995). The endorsement test is not before the court as a basis for standing but as one test utilized by the Court in determining whether a governmental action has the primary effect of advancing religion in violation of the Establishment Clause.

Second, the law of the case is a discretionary rule of practice rather than a binding procedural doctrine. *See United States v. United States Smelting, Refining & Mining Co.,* 339 U.S. 186, 199, 70 S.Ct. 537, 545, 94 L.Ed. 750 (1950); *see also Southern Ry. Co. v. Clift,* 260 U.S. 316, 319, 43 S.Ct. 126, 126–27, 67 L.Ed. 283 (1922). In *Miles v. Kohli & Kaliher Assoc., Ltd.,* the Sixth Circuit found that the doctrine "is not an 'inexorable command,' and will not preclude reconsideration of issues when substantially new evidence has been introduced, when there has been an intervening change of law, or when the first decision was clearly erroneous and enforcement of its command would work substantial injustice." 917 F.2d 235, 241 & n. 7 (6th Cir.1990). Judge Nixon issued the Memorandum on plaintiffs' standing July 16, 1992. (Docket No. 82) A substantial amount of evidence has been added to the record since that time, and interpreting Judge Nixon's decision as precluding consideration of the endorsement test would work a substantial injustice.

For these reasons, the court finds that Lipscomb's argument is without merit.

465 U.S. 668, 691–92, 104 S.Ct. 1355, 1369, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). In application, the "endorsement test requires careful and often difficult line-drawing and is highly context specific . . . ." *County of Allegheny*, 492 U.S. at 631, 109 S.Ct. at 3121 (O'Connor, J., concurring). As a result, "every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion." *Lynch*, 465 U.S. at 693–94, 104 S.Ct. at 1370 (O'Connor, J., concurring). As Justice O'Connor has noted,

> The Clause is more than a negative prohibition against certain narrowly defined forms of government favoritism . . .; it also imposes affirmative obligations that may require a State, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message. That is, the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions.

*Pinette*, 515 U.S. at 777, 115 S.Ct. at 2454 (O'Connor, J., concurring in part and concurring in judgment).

Because the endorsement test is concerned with the message conveyed to average citizens by governmental action, the examination "necessarily focuses upon the perception of a reasonable, informed observer." *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 773, 115 S.Ct. 2440, 2452, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring in part and concurring in judgment); *see also Pinette*, 515 U.S. at 787, 115 S.Ct. at 2458–59 (Souter, J., concurring in part and concurring in judgment) ("Effects matter to the Establishment Clause, and one, principal way that we assess them is by asking whether the practice in question creates the appearance of endorsement to the reasonable observer."); *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos*, 483 U.S. 327, 348, 107 S.Ct. 2862, 2875, 97 L.Ed.2d 273 (1987) (O'Connor, J., concurring in judgment) ("To ascertain whether the statute conveys a message of endorsement, the relevant issue is how it would be perceived by an objective observer, acquainted with the text, legislative history, and implementation of the statute.").

In *Americans United*, the Sixth Circuit, sitting en banc, considered whether a private religious group receiving a permit to display a menorah during Chanukah in a public plaza would convey a message of endorsement. *See* 980 F.2d at 1539–40, 1543–44. In making that determination, the court "adopt[ed] the perspective of a reasonable observer." *Id.* at 1543. The court explained this perspective:

> We wish to emphasize that the endorsement test creates an objective standard, similar to the 'reasonable man' standard of tort law or the 'reasonable person knowing all the relevant facts' who judges judicial disqualification under 28 U.S.C. § 455. *Roberts v. Bailar*, 625 F.2d 125 (6th Cir.1980). Accordingly, we do not ask whether there is any person who could find an endorsement of religion, whether some people may be offended by the display, or whether some reasonable person might think Grand Rapids endorses religion. Instead, we ask whether the reasonable observer would conclude that Grand Rapids endorses religion by allowing Chabad House's display.

*Id.* at 1543–44 (internal footnote omitted). In order to determine what the reasonable observer would conclude in a given situation, the Sixth Circuit found that a court "must examine all the relevant facts, consider carefully the amount of weight to give each fact, and be careful to treat religious displays fairly." *Id.* at 1544. As a result, this court looks to the messages conveyed and the information provided to the general public by Lipscomb regarding its religious beliefs and by the Board in considering and approving the Lipscomb bond issue. Libscomb's statements regarding its overwhelmingly

religious nature can be found in its brochures, catalogs, press releases, web site, and handbooks. *See, e.g.*, Apps. B–F. These items have been discussed in the preceding sections, so the court will focus its attention on information provided by the defendants to the public that indicates the relationship between them and the degree to which the government does or does not support the religious views of Lipscomb.

In this case, the best source of information on which the reasonable observer may rely in determining whether the issuance of tax-exempt revenue bonds by the Board was an endorsement of religion is the Official Statement released by the Board and Lipscomb in connection with the 1991 Bond Re–Issue. In large, bold type on the first page of the Official Statement accompanying the bond issue, the following appears:

**The Industrial Development Board of the Metropolitan Government of Nashville and Davidson County (Tennessee) $15,000,000 Educational Facilities Revenue Refunding Bonds (David Lipscomb University Project), Series 1991**

(Docket No. 1, attach. Ex. D) On initial observation, the reader would clearly connect the Board to Metro and both to the project benefitting David Lipscomb University. The Official Statement then describes the Board as the Issuer and explains the relationship between the Board and the revenue bonds being issued for the benefit of Lipscomb. *See id.* at 1–4. The Board, which prepared the section describing its powers and function, states clearly that it is "an instrumentality of The Metropolitan Government of Nashville and Davidson County." *See id.* at 4. The Official Statement is organized in a manner that places the government's role first and then describes the university, the project,

and the uses of the funds provided through the bond proceeds. *See id.* at 1–26.

The description of Lipscomb provided in the Official Statement details its religious ties and affiliation in significant detail. In this description, Lipscomb states:

As stated in its 1990–1991 school catalog, the supreme purpose of the University is 'to teach the Bible as the revealed will of God to man and as the only and sufficient rule of faith and practice, and to train those who attend in a pure Bible Christianity.' To help fulfill this purpose, each regular student must be enrolled in a Bible class each school day and also attend daily chapel services. The daily Bible classes are taught in a classroom setting under a curriculum designed to give a broad coverage of every book in the Bible in four years. The daily chapel periods, of approximately 20 minutes in length, usually consist of a devotional period of approximately 15 minutes, with the balance of the time used for announcements and other school business. The original land grant of the campus to the predecessor of the University required as a condition of the grant that there be daily Bible classes for all students.

(Docket No. 1, attach. Ex. D at 21) In addition, Lipscomb states that the majority of its students are members of the Churches of Christ and that "[a]ll members of the faculty and administration (other than certain visiting professors) and all members of the Board of Directors of the University are, and must be, members of a Church of Christ." *See id.* at 20, 22. Further, Lipscomb states that its mission, as contained in its strategic plan, is "to serve its students so that they may master knowledge and skills appropriate to them and become Christlike in attitude and behavior." *See id.* at 21. Lipscomb also includes the list of "objectives to which the University and its faculty have made a commitment," *see id.* at 22–23, which can

be found in Appendix C to this opinion.[28] Finally, the description states that "[s]tudents are expected ... to observe biblical standards of conduct ...." and that the university has rules prohibiting "the conduct of religious services on campus by females." *See id.* at 22. Lipscomb admits that the latter might constitute sex discrimination under Title IX, but the university has obtained exemptions for such positions as based on the "religious tenets" of the university. *See id.* Taken together, this description shows Lipscomb to be a strictly religious school whose primary mission is to teach the values and beliefs of the Church of Christ.

The structure and content of the Official Statement indicates to the reasonable observer that the Board, as an instrumentality of Metro, is endorsing the sectarian beliefs and teachings of Lipscomb University. In *Rosenberger*, the Court found that a disclaimer from the University, as the government actor, provided significant evidence that there was no government endorsement, even though the University was providing funding to assist a religious organization. *See* 515 U.S. at 841, 115 S.Ct. at 2523 ("In this case, 'the government has not fostered or encouraged' any mistaken impression that the student newspapers speak for the University .... The University has taken pains to disassociate itself from the private speech involved in this case."). No such disclaimer appears here.[29] As a result, there is nothing to indicate to the reasonable observer that the government is not entirely endorsing the religious views espoused by Lipscomb in the Official Statement.

## III. CONCLUSION

The defendants have raised no genuine issue of material fact as to the nature and beliefs of Lipscomb. The evidence shows that Lipscomb is pervasively sectarian and that its secular functions as an educational institution cannot be separated from its religious mission. The government, through the Board and Metro, chose to provide financial assistance to a sectarian institution without sufficient guarantees that the funds would be used solely to support secular functions of the school. This aid by the government created the perception of government endorsement of the religious views and teachings of David Lipscomb University. As a result, issuance of tax-exempt bonds and the loan of the proceeds of those bonds to Lipscomb had the impermissible effect of advancing the religious beliefs of the aided institution, in violation of the Establishment Clause of the First Amendment. Consequently, the defendants' motions for summary judgment will be denied and the plaintiffs' motion for summary judgment will be granted against all defendants.

The relief granted to the plaintiffs will be that requested in the Complaint. (Docket No. 1 at 24–25) A permanent injunction will issue prohibiting the Industrial Development Board and Metropolitan Government from issuing additional tax-exempt bonds to Lipscomb or bonds to any other pervasively sectarian institution. The plaintiffs shall be awarded $1.00 each as nominal damages and their attorney's fees pursuant to 42 U.S.C. § 1988.

An appropriate Order will enter.

## ORDER

For the reasons expressed in the accompanying Memorandum, the plaintiffs' Motion for Summary Judgment (Docket No. 258) is **GRANTED**. The Motions for Summary Judgment filed by Metropolitan Government of Nashville and Davidson County (Docket No. 189) and by David

---

28. The Objectives included in the Official Statement contained only the listed items, without the further discussion included in the Faculty Handbook, as found in Appendix C.

29. In the final "Miscellaneous" section, the Board, as Issuer, disclaims only liability for any inaccuracy or incompleteness of any information not provided by the Board. (Docket No. 1, attach. Ex. D at 36–37)

Lipscomb University (Docket No. 193) are **DENIED.**

A permanent injunction is hereby **IS-SUED,** enjoining the Industrial Development Board and Metropolitan Government of Nashville and Davidson County from issuing additional tax-exempt bonds for the benefit of David Lipscomb University or for any other pervasively sectarian institution. The plaintiffs shall be awarded $1.00 each as nominal damages and their attorney's fees pursuant to 42 U.S.C. § 1988.

### APPENDIX A

404 Minerva Drive

Murfreesboro, Tn. 37130

April 17, 1990

Mayor Bill Boner

Nashville, Tn.

Dear Bill,

Perhaps you remember me from your Murfreesboro days at MTSU. I am an alumnus of David Lipscomb, its dean for eight years, and I support it financially, and my children attended school there. Still I am solidly opposed to the issuance of Metro industrial bonds to build a library building at the institution because it is a religious corporation and such financial aid is in direct violation of the Constitution's rule that government shall make no law respecting (that is, having anything to do with) an establishment of religion.

The insistence that a library at Lipscomb is a purely secular enterprise is dishonest. Let me show you why. The Bible department enrolls every student at Lipscomb in a five-day [per week] Bible class throughout his four-year residence there. Any other department is a pygmy compared with this one. It follows that the library inescapably served the Bible department far more that it does any other department.

Added to this is the fact that the Bible department offers a graduate degree in religion, the basis for the recent change in name from college to university. The library must house a vast collection of religion books to serve this graduate program. On top of that, plans for the library include special housing of a section relating to the history of the Church of Christ in America to include periodicals, books, manuscripts, church records, and the like on the model of the Disciples of Christ Historical Library in Nashville. Finally, the library will not house journals of other denominations. Lipscomb's catalog declares that the religious approach is made in every department, whether biology, chemistry, or geography, and the library books are chosen to reflect this perspective. If you examine the corporation charter of Lipscomb, you will find that makes Lipscomb a religious corporation. No person can be employed at Lipscomb who is not a member of the mainline Church of Christ. He cannot be a premillennialist or believe that instrumental music is acceptable for worship of God. He must believe that a divorced person cannot remarry and continue in church. He must believe that a woman cannot teach a class in religion to men.

I urge you, out of respect for the Constitution that you do not give assent to the issuance of $15,000,000 in tax-free bonds, worth two to three percent per year, to finance the proposed Lipscomb library.

Sincerely,

/s/ Norman L. Parks /s/

Norman L. Parks

(Docket No. 206, Deposition of William Hill Boner, attach. Ex. 6).

### APPENDIX B

(from Faculty Handbook, David Lipscomb University, 1989–90)[30]

30. According to the first page of the Faculty Handbook, it

## PART II

## THE HERITAGE

The present Board of Directors and administration of David Lipscomb University are dedicated to maintaining the original purposes of the university as stated in the preceding Part I of this handbook.

It is imperative that those of us who devote our strength to the work of the university understand and share the convictions which brought it into being. This is especially true in view of the fact that many of the spiritual problems which prevailed in 1891 exist today.

The history of higher education in the United States reveals that many religious groups have founded schools to offset secularism and promote their interests. It is sobering to realize that few of these schools have completed even one century in loyalty to their original purposes. This tragic denial of founding ideals must not befall David Lipscomb University.

The early decades of the nineteenth century witnessed the rise of that religious movement known as the Restoration. The conviction grew in many quarters that a basis for unity could be found in accepting the Bible as the full and final revelation of God to man and as the only sufficient rule of faith and practice in religion. The determination to settle all spiritual questions by an appeal to Scripture, and a willingness to be bound by anything taught in the Book, became the single most distinguishable feature of the movement.

The restoration principle continues to have relevance in every generation. Each person involved in this effort must accept the responsibility and privilege of examining any issue in the light of it. Any unwillingness to go to the Bible to determine truth; any acceptance of brotherhood standards as the basis of authority; and any reluctance to face any issue in the light of this approach are denials of the spirit which brought this school into existence. The questions, problems and issues change through the years; the need to seek solutions in the revelation of God and goodwill toward man does not change.

In 1888, James A. Harding and David Lipscomb, two Christian scholars, agreed to combine their abilities to build an institution that would continue to promote the restoration principle. They concluded that this could best be done by founding a school whose purpose was to teach the Bible as a central part of its curriculum. From its beginning a great host of Christians shared the convictions of the founders and contributed both as congregations and as individuals to make possible the school's existence. From then until now members of the churches of Christ have supported the school with both students and money.

Through the years some basic conditions and commitments have distinguished David Lipscomb University from many other institutions. A prerequisite for membership on the faculty is loyalty to New Testament Christianity as understood and traditionally practiced among churches of Christ. This includes complete and unwavering acceptance of the Bible as the divinely inspired word of God; faithfulness in personal life to those ideals and habits which contribute to purity and opposition to the various forms of worldliness; and active participation in the work of a local congregation. Acceptance of a position on the faculty is considered a commitment to these principles. Opposition to them either in teaching, personal life, or influence would have to be judged a violation of the contract between a teacher and the univer-

includes official statements of regulations for the faculty of David Lipscomb University. The faculty handbook is binding upon each member of the faculty and staff and becomes a part of the contractual agreement between employees and the universi-

ty. The provisions of the handbook are superseded only by the provisions of the bylaws of the Board of Directors and/or decisions made by the Board.
(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at i)

sity. A clause to that effect is inserted in the contract of every teacher.

Within the scope of these basic commitments, Lipscomb is dedicated to quality education—to building the very best university of liberal arts that we are capable of building. This university is obligated to higher learning and to standards of scholarship. The motto of David Lipscomb University is this: "Ye shall know the truth, and the truth shall make you free." The entire concept of education at Lipscomb is based on firm convictions concerning this statement.

These convictions are:

1. That there is eternal truth—a rejection of moral relativism.
2. That this truth can be learned and relied upon.
3. That truth is consistent throughout the universe.
4. That there is not, and cannot be, any conflict between truth in religion, and truth in any other field. Where such conflict seems to exist, human understanding is in error.

Another fundamental part of the heritage with which we have been entrusted is the concept that final authority in all matters rests with the Board of Directors. David Lipscomb University differs from a publicly-supported institution which logically reflects the ideals and purposes of the public to which it belongs; it is rather the embodiment of certain principles which are offered to the public as a special type of education. No attempt can be made to bring the university into conformity with the standards of others, for to do so would fundamentally alter the nature of the institution. This necessarily means that the Board of Directors has constant responsibility to plan and guide the activities of the institution in the light of its own purposes; to make all decisions in matters of fundamental policy; and to see to it that the university remains loyal to its historic objectives, both in theory and in practice.

The control of the institution, therefore, cannot be turned over to any group other than its Board, whether administration, faculty, students, alumni, or patrons.

An insistence on excellence of academic work is also a distinguishing feature of the Lipscomb heritage. Since the cause we serve is *Christian* education, we dare not be content with inferior quality in such an undertaking. This requires on the part of the faculty continued self-evaluation to determine whether we are actually making the preparation and conducting ourselves in the classroom in keeping with the name of Christ; it also demands of every student the highest level of achievement of which he/she is capable. To permit students to pass without effort or by the effort of others; to bring upon ourselves just criticism for mediocre performance of our duties; or to encourage idleness or below-standard work by our indifference is to fail to "work with all (our) heart, as working for the Lord."

The faculty of David Lipscomb University has shared the joy of service since the first term in 1891. Those who have taught here have done so because they were convinced that they could accomplish good for man while serving God. Faithfulness to this trust requires unselfish devotion to young people and to the Lord and the ability to find satisfaction in this work. To do otherwise would be unworthy of the sacrifices of those who have gone before.

This heritage we receive, not merely as an expression of the uniqueness of the institution but as a dedication to all who will come after us. It is our privilege to work with pride in these principles in the name of our Lord and to pass on to succeeding generations the ideals which give to David Lipscomb University its reason for existence.

(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 5-6)

738

## APPENDIX C

(from Faculty Handbook, David Lipscomb University, 1989–90) [31]

### PART I

### WHY DAVID LIPSCOMB UNIVERSITY?

The continuing and increasing emphasis on publicly-supported education inevitably raises the question, Why David Lipscomb University? This matter is especially significant for those who comprise the faculty, for justification of the existence of the university is also justification for every effort put forth by each individual associated in its work.

Education has meaning because "the mind of man is the candle of the Lord." To assume that the training of young people deals exclusively with those mental processes by which they learn facts and arrive at conclusions is tragically shortsighted. History has taught us that education alone is no panacea for the problems that plague mankind. It is only as men's minds are undergirded with principles of righteousness, guided by worthy purposes, and dedicated to the service of men and the glory of God that education serves its true purpose. This is the reason David Lipscomb University exists.

The mission of David Lipscomb University is to serve its students so that they may master knowledge and skills appropriate to them and become Christlike in attitude and behavior.

It must be kept firmly in the consciousness of all connected with the institution—administration, faculty, students, and patrons—that Lipscomb is a *Christian school.* In the original appeal for support, written by David Lipscomb, it was made clear that the Bible was to be the foundation upon which all else would center:

The supreme purpose of the school shall be to teach the Bible as the revealed will of God to man and as the only and sufficient rule of faith and practice, and to train those who will attend in a pure Bible Christianity, excluding from the faith all opinions and philosophies of men, and from the work and worship of the church of God all human inventions and devices. Such other branches of learning may be added as will aid in the understanding and teaching of the Scriptures and as will promote usefulness and good citizenship among men.

This purpose was further set forth in the deed conveying the property on Spruce Street for the use of the school as follows:

... that the property shall be used for maintaining a school in which, in addition to other branches of learning, the Bible as the recorded will of God and the only standard of faith and practice in religion, excluding all human systems and opinions and all innovations, inventions, and devices of men from the service and worship of God, shall be taught as a regular daily study to all who shall attend said school and for no other purpose inconsistent with this object. The condition being herein inserted at the request of the founders of the proposed Bible School, the same is hereby declared fundamental and shall adhere to the premises conveyed as an imperative restriction upon their use so long as the same shall be owned by said Bible School, or its Trustees, and to any and all property which may be purchased with the proceeds of said premises in case of sale or reinvestment, as hereinafter provided.

David Lipscomb University is not, therefore, merely an institution which requires every student to take a lesson in the Bible each day; this study is the wellspring from which the university issued.

---

31. *See supra,* note 30.

This basic principle applies also to the other distinguishing features of the institution. Daily chapel worship, the purposeful direction of every activity to the glory of God, opposition to worldliness, and the provision of a carefully controlled environment are essentials which compose the very warp and woof of the university. Any compromise or surrender of these commitments would leave no logical justification for the existence of the institution. They are received by us in sacred trust from all who have labored to make possible the campus we enjoy, and must be passed untarnished to those who will come after us. How faithfully we discharge this trust will determine our continuing ability to stand as an institution of peculiar purposes and holy aspirations. If we should fail, the university would lose its identity and become only another small unit in the vast complex of mass education.

Within this framework, the specific objects to be sought have been stated by the faculty and administration as follows:

*Objectives*

1. To provide the very best in a Christian liberal arts education under the direction of Christian teachers in a distinctively Christian environment.

   David Lipscomb University is committed to the highest standard of scholarship and at the same time is dedicated to the building of Christian character as the ultimate goal.

2. To equip the student to communicate clearly, logically, and effectively through reading, writing, speaking, and listening.

   David Lipscomb University realizes that the mastery of the skills of communication is an important asset in any field of work as well as in all human relations, and that it is of supreme importance to the work of spreading the kingdom of God.

3. To give the student a basic economic understanding and ability to choose a vocation that will make the best use of his/her talents in earning a living and in serving God and his/her fellowman.

   David Lipscomb University believes that a Bible-centered liberal arts education is the best general preparation for any business or profession. Special training in a chosen field becomes more meaningful when based on this foundation, and the person thus educated is better able to take his/her place in a democratic society as a responsible, free citizen.

4. To encourage the development of an appreciation for the beautiful.

   David Lipscomb University strives for this positive approach to the development of high ethical and moral principles: to lead the minds of students in the direction of "whatever is true, whatever is noble, whatever is right, whatever is pure, whatever is lovely, whatever is admirable," as Paul urges in Philippians 4:8. The completely educated man or woman would be able to appreciate the finest in music, art, literature, and nature as well as the true beauty of spiritual goodness.

5. To train future leaders in the church.

   David Lipscomb University recognizes and endeavors to measure up to its responsibility as a Christian liberal arts university to train future preachers, teachers, song leaders, elders, deacons, and other leaders who will put the work of the Lord's church first in their lives, regardless of whether their chosen profession is law, medicine, a business career, preaching, teaching, singing, or any other work or vocation.

6. To train future leaders in all honorable professions and vocations.

   David Lipscomb University further recognizes its responsibility as a Christian liberal arts university to provide Christian leadership for all honorable professions and vocations. One of Lipscomb's most cherished goals is to see dedicated Christians of

outstanding ability and talent placed in high positions of leadership in all such occupations.

7. To develop socially responsible citizens.

David Lipscomb University seeks to equip its students with a basic knowledge of American institutions which deal with our historical, political, social, scientific, and religious heritage; to produce good citizens concerned with perpetuating the best in our American tradition and democratic was of life; and, with an awareness of changing world conditions, to produce leadership in the promotion of civic, national and international understanding and goodwill.

8. To prepare young men and women for their future roles as builders of the home, as husbands and wives, and as fathers and mothers.

David Lipscomb University considers no phase of life preparation more important than the training for a successful partnership in a happy home life. Complete education requires such preparation.

9. To stimulate intellectual curiosity.

David Lipscomb University earnestly strives to create within its students an inquisitive mind and desire to know. While providing an introduction to scholarly habits and pursuits, Lipscomb seeks to inspire each student with an eagerness to learn, a determination to achieve and a devotion to truth consistent with the principle: "Ye shall know the truth, and the truth shall make you free."

10. To hold up Christ as the example to follow in every field of activity, in elementary, middle, high school, and in the university, as well as later in life.

David Lipscomb University has established as the sure criterion for students in formulating standards of conduct, on the campus and off, an honest answer to this question: "Is this what Jesus would have me do?"

(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 1–3)

## APPENDIX D

(from Faculty Handbook, David Lipscomb University, 1989–90) [32]

### PART IX

### FACULTY AND STAFF MEMBERS AS MODELS AND EXAMPLES

The highest level of professional behavior is expected from each member of the university faculty. Each is expected to exemplify in personal habits and manner of life the very best in Christian example.

Every faculty member is bound by contractual agreement as a basic condition for employment with the university to "conscientiously and actively support in teaching, and in personal life, the academic and religious policies of David Lipscomb University as interpreted and announced by the Board of Directors and/or the administration."

This contractual agreement requires that every member of the faculty be a faithful member of the church. The principle of serving as good Christian examples before students requires that each faculty member also be active in good works and church-supported programs.

Regular attendance at worship services and Bible studies is necessary for proper Christian growth. Faculty members are expected to encourage students directly and by example to attend the regular services of a local congregation.

It is this principle of serving as examples before students which causes the university to refuse to employ faculty members who use tobacco, alcohol or drugs.

32. *See supra,* note 30.

Neither do we wish to have faculty members who engage in activities that might be considered worldly by others.

By this same principle, we expect faculty members to present modest taste in all wearing apparel. Male members of the faculty are requested to wear coats and ties and refrain from casual dress. Female members of the faculty are also asked to wear appropriate dresses, suits and other professional attire.

This same principle prevents the university from employing divorced persons. We realize that there are divorces accepted by churches of Christ. However, we also believe that God never planned divorce as the best situation for any Christian.[33]

The above specific items clearly indicate the university's high expectation regarding faculty conduct and example. This has been true throughout the history of the university.

It is obviously impossible to provide details for all situations that might arise under this principle. Any faculty member with a question or suggestion in regard to this basic principle should feel free to discuss the matter with the university administration.

(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 61)

### APPENDIX E

(excerpts from Faculty Handbook, David Lipscomb University, 1989–90)[34]

### PART III

### ORGANIZATION AND GOVERNMENT

. . .

*Christian Government for a Christian University*

The operative principle in a Christian university community is mutual respect and trust. It is assumed that all members of this community will respect policies and regulations and will act as responsible individuals.

Students in this Christian environment must recognize the responsibility the university has assumed for their welfare and must also accept the guidance and supervision that accompanies such responsibility. Those who are in positions of authority must have the responsive cooperation of those for whom they are responsible. Oversight and responsibility are inseparable.

It is expressly understood that each student applying for admission to any division of Lipscomb and each faculty and staff member employed thereby accepts these fundamental principles as a condition of admission or employment.

The work of the Board of Directors is to establish basic principles for the operation of the university; the president, administrative officers, faculty, and staff, working together, implement the decisions of the Board; and the students are encouraged to study, learn, and grow in the environment which is provided. Each must work in his/her own sphere. When this is done, the good of all is served.

*Christian Education at David Lipscomb University*

Christian education requires self-discipline in the areas of personal behavior, academic scholarship, and participation in campus life. Ideally it is a holistic process that facilitates competent self-direction in preparation for adulthood. It presumes respect for instruction and supervision and the development of a strong sense of individual responsibility.

**33.** This paragraph was deleted from Part IX of the Faculty Handbook in the 1990–91 edition. (Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(B) at 49)

**34.** *See supra,* note 30.

The basic concept of Christian education at David Lipscomb University includes a sincere interest in the total life of each student as an individual person. Lipscomb genuinely cares about what each student attending this institution at any level thinks, believes, or does. Christian education as understood here is dedicated to placing in the hearts, minds, and lives of young people all that God has revealed in the Bible and the very best that man has learned, discovered, or experienced during his sojourn on this planet.

While David Lipscomb University will encourage every student to think and to believe what the university understands to be good and right, no student can be required to think or to believe any particular thing. Faith is based on personal conviction which cannot be legislated or forced upon any person. This is not in any sense the same as saying that Lipscomb has no interest in what the young people here think and believe. It is intended to say that the only control over what students think and believe must be exercised through teaching and example.

In contrast, the university does have the prerogative to control what can and cannot be done on this campus and what can and cannot be done by any student enrolled. Accordingly, each student specifically and affirmatively agrees to abide by the regulations and requirements of David Lipscomb University as a condition of admission.

Each student has the unquestioned right to decide whether to attend Lipscomb or not. Those who decide to apply for admission to Lipscomb thereby accept the standards, regulations, and requirements of the university. This principle is a cornerstone in the successful operation of a Christian university.

. . . .

(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 26(A) at 7–8)

(excerpts from Brochure of David Lipscomb University)

. . .

"In favor with God" is at the heart of every program and activity at Lipscomb University. Lipscomb is one of the few universities where faculty and students assemble for a few minutes each day to sing praises to God and study the Bible. In classes the Bible is taught simply as the inspired, revealed word of God to man. But these organized activities are only a small portion of the spiritual emphasis of Lipscomb.

Spontaneous, student-led devotionals, as well as weekly outdoor devotionals, create a spiritual atmosphere rarely experienced in a university environment. Interested students participate in many extracurricular activities that contribute directly to this spiritual atmosphere: singing at nursing homes, tutoring underprivileged children, providing meals for the homeless, working with Special Olympics, or actively preparing for mission work.

From the moment a new student steps on the campus, he or she recognizes that Lipscomb is distinctive. Caring faculty and friendly students respond in ways that reflect the university's commitment to educating the whole person. Bible classes not only teach more about God's will but also give each student the opportunity to develop his or her own personal relationship with the Lord.

The Lipscomb University student body is a unique blend of backgrounds, interests, and personalities. One common thread that binds students together is their commitment to Christ. At Lipscomb a student's love for the Lord is strengthened by this special association with other students, the majority of whom share the same spiritual values.

(Docket No. 209, Deposition of Harold Hazelip, attach. Ex. 25)